IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
_____

| | | |
|---|---|---|
| SILVIA M. O'HARO, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO 1:18-CV-2073 |
| v. | : | |
| | : | Honorable Christopher C. Conner |
| HARRISBURG AREA COMMUNITY | : | |
| COLLEGE | : | |
| | : | |
| Defendant | : | |

_____

**DEFENDANT HARRISBURG AREA COMMUNITY COLLEGE'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

BARLEY SNYDER, LLP

David J. Freedman, Esq. (Pa. Bar No. 207257)
dfreedman@barley.com
Kareemah Mayer, Esq. (Pa. Bar No. 326031)
kmayer@barley.com
126 East King Street
Lancaster, PA 17602-2893
Tel:  (717) 299-5201
Fax: (717) 291-4660
*Attorneys for Defendant Harrisburg Area
Community College*

## **TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................1

II.    PROCEDURAL HISTORY ....................................................................2

III.   UNDISPUTED FACTS ...........................................................................3

    A.    HACC's Nursing Program ...........................................................3

    B.    O'Haro failed Nursing 206 during the Fall 2014 semester. ..................5

    C.    O'Haro failed Nursing 250 during the Spring 2015 semester. ...........10

        1.    O'Haro committed major medication administration errors on February 12, 2015. ....................................................10

        2.    O'Haro made significant critical thinking errors on February 13, 2015. ....................................................................14

        3.    Lott and LaRue gave O'Haro a final opportunity to remediate her "not met" clinical evaluations. ...........................16

        4.    O'Haro made additional errors during her final clinical rotation on February 19, 2015. ....................................................18

    D.    O'Haro has not become a registered nurse since her removal from HACC's program. .......................................................................23

IV.    STATEMENT OF QUESTIONS INVOLVED ...........................................25

V.     LEGAL STANDARD: RULE 56 MOTION FOR  SUMMARY JUDGMENT ...........................................................................................25

VI.    ARGUMENT .........................................................................................26

    A.    O'Haro cannot establish a *prima facie* case of race or national origin discrimination. .................................................................26

    B.    O'Haro cannot establish pretext. .......................................................29

        1.    O'Haro's denials don't establish pretext. .................................29

2.     O'Haro has not established that she was similarly-situated to other students who passed. ......................................32

C.     O'Haro cannot prove that HACC retaliated against her. ...................42

D.     O'Haro's back pay claim must be stricken. ......................................43

VII.   CONCLUSION..............................................................................46

WORD COUNT CERTIFICATION ......................................................49

INDEX OF UNREPORTED CASES .....................................Appendix A

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Booker v. Taylor Milk Co.*,
64 F.3d 860 (3d Cir. 1995) ..............................................................................45

*Cain v. WellSpan Health*,
Civil Action No. 1: 08-CV-1704, 2009 WL 5112352 (M.D. Pa.
Dec. 17, 2009)..................................................................................................34

*Dawn L. v. Greater Johnstown Sch. Dist.*,
586 F. Supp.2d 332 (W.D. Pa. 2008).................................................................44

*Donlin v. Philips Lighting North America Corp.*,
581 F.3d 73 (3d Cir. 2009) ...............................................................................43

*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994) ........................................................................30, 31

*Hajjar-Nejad v. George Washington Univ.*,
37 F. Supp.3d 90 (D.D.C. 2014).......................................................................29

*Holifield v. Reno*,
115 F.3d 155 (11th Cir. 1997) ..........................................................................34

*Jones v. School Dist. of Phila.*,
198 F.3d 403 (3d Cir. 1999) .............................................................................27

*Ke v. Drexel Univ.*,
Civil Action No. 11-6708, 2015 WL 5316492 (E.D. Pa. Sept. 4,
2015) .............................................................................................................28, 42

*Keller v. Orix Credit Alliance*,
130 F.3d 1101 (3d Cir. 1997) (*en banc*) ...........................................................32

*Manning v. Temple Univ.*,
No. Civ.A. 03-4012, 2004 WL 3019230 (E.D. Pa. Dec. 30, 2004)
*aff'd* 157 Fed. Appx. 509 (3d Cir. 2005).............................................................30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)..........................................................................................26

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 ......................................................................................27

*McKnight v. Kimberly Clark Corp.*,
   149 F.3d 1125 (10th Cir. 1998) ...........................................................32

*Miller v. Thomas Jefferson Hosp.*,
   908 F. Supp.2d 639 (E.D. Pa. 2012)...................................................27

*Mohebi v. York Hosp.*,
   Civil Action No. 1:07-CV-2255, 2009 WL 648981 (M.D. Pa. Mar.
   10, 2009) (Conner, J.) ........................................................................36

*Opsatnik v. Norfolk Southern Corp.*,
   335 Fed. Appx. 220 (3d Cir. 2009).....................................................33

*Reeves v. Shawnee State Univ.*,
   Case No. 1:16-cv-765, 2018 WL 582555 (S.D. Ohio Jan. 29, 2018) ...............34

*Regents of Univ. of Michigan v. Ewing*,
   474 U.S. 214 (1985)..........................................................29, 32, 42

*Smith v. City of Allentown*,
   589 F.3d 684 (3d Cir. 2009) ...............................................................41

*Thomas v. Advance Housing, Inc.*,
   475 Fed. Appx. 405 (3d Cir. 2012)......................................................3

*Underwood v. La Salle Univ.*,
   Civil Action No. 07-144, 2007 WL 4245737 (E.D. Pa. Dec. 3,
   2007) ....................................................................................................31

*University of Missouri v. Horowitz*,
   435 U.S. 78 (1978).............................................................................29

## Rules

Fed. R. Evid. 801(c) ...................................................................................41

Fed. R. Civ. P. 56 ...........................................................................2, 26, 27

iv

**Statutes**

42 Pa. Cons. Stat. § 5524 ............................................................................3

42 U.S.C. § 1981 ..............................................................................*passim*

42 U.S.C. §§ 2000e *et seq.*....................................................................2, 3

42 U.S.C. § 2000d *et seq.*........................................................................2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
_____

| | | |
|---|---|---|
| SILVIA M. O'HARO, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO 1:18-CV-2073 |
| v. | : | |
| | : | Honorable Christopher C. Conner |
| HARRISBURG AREA COMMUNITY | : | |
| COLLEGE | : | |
| | : | |
| Defendant | : | |

_____

## DEFENDANT HARRISBURG AREA COMMUNITY COLLEGE'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Plaintiff Silvia O'Haro is a former student in Defendant Harrisburg Area Community College's Nursing program. The College's faculty removed O'Haro from the program after she failed the program's final semester twice. O'Haro, who is African-American and hails from Jamaica, has sued the College under 42 U.S.C. § 1981. O'Haro claims that the College removed her from the program based on her race or national origin and in retaliation for her accusing College officials of discrimination.

The Nursing program's guidelines, however, required the removal of any student who failed two Nursing courses. And O'Haro has not adduced any evidence from which a reasonable fact finder could conclude that complying with those guidelines masked discrimination or retaliation.

1

Accordingly, HACC requests that the Court enter summary judgment for the College in accordance with Rule 56 of the Federal Rules of Civil Procedure.

## II.    PROCEDURAL HISTORY

On March 31, 2015, O'Haro filed a discrimination questionnaire with the Pennsylvania Human Relations Commission ("PHRC"). The questionnaire accused Harrisburg Area Community College ("HACC") of discriminating and retaliating against O'Haro by removing her from the College's Nursing program.

After conducting an exhaustive inquiry over almost two years, the PHRC dismissed O'Haro's complaint on October 27, 2016. In its dismissal letter, the PHRC investigator concluded "the facts of the case do not establish that probable cause exists to credit the allegations of unlawful discrimination."[1] O'Haro did not appeal that determination or take any action for the next two years.

Then on October 25, 2018—well over three years after her removal from the Nursing program—O'Haro filed the current lawsuit. Originally, she asserted claims against HACC under Title VI and Title VII of the Civil Rights Act, 42 U.S.C. § 2000d *et seq.* § 2000e-1 *et seq.*[2] Procedural defects, however, plagued those claims.[3]

_____

[1] (October 27, 2016 Letter from the PHRC, attached as Exhibit 39).
[2] (*See* Complaint (Doc. 1) at Count I (Title VII Claim) and Amended Complaint (Doc. 6) at Count I (Title VI Claim)).
[3] O'Haro failed to file a charge of discrimination with the United States Equal Employment Opportunity Commission, and HACC never employed O'Haro. That

Eventually, O'Haro filed a second amended complaint limiting her claims to allegations of discrimination and retaliation under 42 U.S.C. § 1981.[4] The parties concluded fact discovery on September 30, 2019. Currently, the case is set for trial in May, 2020.[5]

### III.   UNDISPUTED FACTS

A.   HACC's Nursing Program

HACC is Pennsylvania's largest community college, with over 50,000 total students enrolled at the College's five campuses and through its online component. HACC's Registered Nursing program provides qualified students the opportunity to earn an associate degree. Upon earning that degree, students are eligible to sit for the National Council Licensure Examination, which is commonly referred to as the "NCLEX exam." Students cannot become licensed registered nurses without both passing a state-approved associate degree program (like HACC's) and the NCLEX exam.[6]

---

doomed the Title VII claim. *See* 42 U.S.C. §§ 2000e-2(a) and 2000e-5. O'Haro failed to file suit within Title VI's two-year statute of limitation. *See Thomas v. Advance Housing, Inc.*, 475 Fed. Appx. 405, 406 (3d Cir. 2012) (applying state law personal injury statute of limitation to Title VI claim); *see also* 42 Pa. Cons. Stat. § 5524 (establishing two-year statute of limitation for personal injury claims under Pennsylvania law).

[4] (*See* Doc. 17).
[5] (*See* Doc. 26).
[6] (*See* HACC's Statement of Material Undisputed Facts ("Statement"), ¶¶ 1-4).

Each Nursing course in HACC's program features a combination of classwork learning and real-life clinical experiences. In the classroom phase—what HACC faculty call "the theory component"—students receive academic training, which the faculty test through written examinations, quizzes, and assignments.

During the courses' clinical components, students obtain real-life experience treating patients at health care facilities under the direction and supervision of licensed practitioners. As a student progresses through the program, skills increase in complexity until the student demonstrates sufficient proficiency to transition safely into professional practice. Along the way, the student learns and practices required skills in the program's nursing laboratory. The faculty then validate the student's performance while the student treats patients in clinical settings.[7]

To pass a particular course, students must satisfactorily complete both the theory and clinical components of that course during the same semester. For theory, this means the student must achieve an overall average of at least 75% on written exams. Students must meet all clinical evaluation criteria to complete each course's clinical component. Additionally, students must maintain at least a 2.0 overall grade point average to continue in the program from one semester to the next.[8]

---

[7] (*See* Statement, ¶¶ 5, 7, 9-12).
[8] (*See* Statement, ¶¶ 6, 8, and 14).

4

While O'Haro was enrolled in HACC's program, any student who failed two Nursing program courses would be removed from the associate degree program. Such a student, however, could enroll in HACC's Practical Nursing certificate program. Upon attaining that certificate and passing the Practical Nurse licensing exam, the student would be eligible for re-admission to the associate degree program, with credit given for courses previously passed.[9]

B.    O'Haro failed Nursing 206 during the Fall 2014 semester.

Silvia O'Haro has wanted to become a nurse for many years. No one doubts the sincerity of her desire. O'Haro, however, has failed to demonstrate the minimum competency necessary to achieve that goal.

O'Haro's struggles began long before she ever set foot on HACC's Gettysburg Campus. Almost a decade before she began HACC's program, O'Haro enrolled in the Nursing program at Hagerstown Community College in Maryland. In May of 2001, she failed out of that program with a 1.6 grade point average.[10]

Over a decade later, O'Haro enrolled in HACC's Nursing program at the College's Gettysburg Campus. Although O'Haro exhibited enthusiasm and passion for her work, she struggled significantly with both the theory and clinical

---

[9] (*See* Statement, ¶¶ 15-17).
[10] (*See* Statement, ¶¶ 18-19).

components during the program's early courses. Nevertheless, O'Haro was able to push her way through and pass those courses.[11]

For the Fall 2014 semester, O'Haro enrolled in Nursing 206, the program's final—and most rigorous—course. Along with a grueling theory component, the nine-credit, semester-long course required students to complete clinical rotations relating to acute care, medical/surgical care, pediatric medicine, and critical care. During these clinical rotations, faculty tasked students with administering care and completing related documentation similar to what would be required of them as professional nurses.[12]

One of the most important requirements of Nursing 206's clinical component involved evaluating students' application of critical thinking skills. After all, nurses don't simply take orders and administer medication without thinking. Instead, nurses are responsible for ensuring patients' safety and facilitating treatment outcomes. As a result, nurses must understand—and be able to articulate—treatment methods and the purposes of prescribed medications.[13]

Several of O'Haro's Nursing 206 clinical instructors expressed significant concerns regarding her clinical performance, particularly with respect to her

---

[11] (*See* Statement, ¶¶ 20-22).
[12] (*See* Statement, ¶¶ 23-27).
[13] (*See* Statement, ¶¶ 28-31).

critical thinking skills.[14] Throughout the semester, instructors made negative comments regarding O'Haro's performance, such as "Very strong concerns about Silvia's grasp of care of the patient from a clinical perspective."[15] Another instructor noted that O'Haro was "[u]nable to discuss why [the] patient was getting a medication and [its therapeutic] effect."[16] In response to a written clinical assignment, another instructor told O'Haro, "Your problem identification . . . is too basic for . . . N206 critical thinking."[17]

At the same time O'Haro struggled with her clinical placements, she was failing Nursing 206's theory component. On October 9, 2014, the Nursing program's faculty leadership sent O'Haro a letter notifying her that she was in danger of failing the course's theory component. In follow up to that letter, Professor Caren LaRue (the lead classroom instructor for Nursing 206) met with O'Haro to explain that she would need to score an 81.5% (75 points out of a total 92) on the final exam to pass Nursing 206. O'Haro had averaged 72% on the course's first five exams before the final.[18]

Professor Jill Lott, the Director for the Gettysburg Campus program, also met with O'Haro to discuss her options before the final exam. During that meeting,

---

[14] (*See* Statement, ¶¶ 32-34).

[15] (*See* O'Haro's N206 Clinical Evaluation tool, attached as Exhibit 11, p. 4).

[16] (*See id*., at p. 9).

[17] (*See id*., at p. 16).

[18] (*See* Statement, ¶¶ 36-38).

7

Lott explained that O'Haro still had the option of withdrawing from the course. Such a withdrawal would not have affected O'Haro's grade point average. On the other hand, taking the final exam put O'Haro at risk of being removed from the program altogether. Depending upon her score on the final, failing Nursing 206 might take O'Haro's overall grade point average below the required 2.0 to continue taking Nursing courses. Thus, withdrawing from Nursing 206 before the final would ensure that O'Haro would be able to return to the program the following semester, while O'Haro risked being barred from the program if she took the final exam and didn't score high enough.[19]

Regardless, everything would be riding on O'Haro's performance during the Spring 2015 semester. If O'Haro failed to net an 81.5% on Nursing 206's final, she would fail that course. Although her grade point average might be high enough to keep her in the program, HACC had already decided to change the program's curriculum at the Gettysburg Campus starting the Spring 2015 semester. Under the new curriculum, Nursing 206 would be split into three separate "mini-mester" courses: Nursing 250, Nursing 251, and Nursing 243.[20]

If O'Haro didn't achieve the required grade on Nursing 206's final, then she would have to run the table by passing both the clinical and theory portions in Nursing 250, Nursing 251, and Nursing 243 during the Spring 2015 semester. This

---

[19] (*See* Statement, ¶¶ 37-41).
[20] (*See* Statement, ¶¶ 37-38 and 42-44).

seemed like a daunting task for a student who had struggled with both the theory and clinical components of Nursing 206.[21]

When Lott explained this, O'Haro responded that she felt the Nursing faculty was discriminating against her based on her race. Although O'Haro didn't explain the basis for that belief, Lott instructed O'Haro that such accusations must be directed to Leslie Boon, the Interim Campus Dean of Academic Affairs for the Gettysburg Campus at the time. O'Haro never did that.[22]

Instead, she decided to roll the dice and took Nursing 206's final exam.

She failed. She scored 64.5 out of 92 points, an approximately 70% score. That left her at least 8.5 course points short of passing, which resulted in a "D" grade. Again, the program's grading criteria required students to obtain at least a "C" grade to pass any Nursing program course. Two other students—both Caucasian—received failing grades in Nursing 206 because of their performance in the course's theory component.[23]

O'Haro did not file a grade appeal challenging the failing grade she received in Nursing 206. Instead, she filled out the paperwork to enroll in the three "mini-mester" courses at the Gettysburg Campus. In those forms, O'Haro wrote that during the upcoming semester she intended to "study harder. Seek help on

---

[21] (*See* Statement, ¶ 44).
[22] (*See* Statement, ¶¶ 39-40 and 45-47).
[23] (*See* Statement, ¶¶ 48-50).

problem[s] that [are] difficult. Try to prioritize school and work." O'Haro, however, made no mention of having suffered any sort of discrimination during Nursing 206.[24]

C.      O'Haro failed Nursing 250 during the Spring 2015 semester.

1.      **O'Haro committed major medication administration errors on February 12, 2015.**

O'Haro began the three-course semester with Nursing 250. She performed well in that course's theory component. Likewise, O'Haro initially performed well in Nursing 250's clinical component. Specifically, Professors LaRue and Connie Miller both issued O'Haro "met" evaluations during her first six clinical days in Nursing 250, meaning O'Haro had satisfied all the clinical criteria during those placements. In fact, on February 6, 2015, Professor LaRue praised O'Haro's work, exclaiming "Good job!"[25]

O'Haro's clinical performance, however, fell off dramatically during a medical/surgical placement at Carlisle Hospital on February 12, 2015. That day, Professor LaRue tasked O'Haro with administering Cozaar PO, a high blood pressure medication, to a patient. When she attempted to administer the medication, O'Haro told the patient, "I have your PO med." That statement puzzled the patient, who asked "PO?" At that point, LaRue—who was in the

---

[24] (*See* Statement, ¶¶ 51-55).
[25] (*See* Statement, ¶¶ 56-58; *see also* O'Haro's N250 Clinical Evaluation Tool, attached as Exhibit 19, at Bates No. D000805).

room—instructed O'Haro to explain the medication to the patient. O'Haro stated, "Cozaar—it's for your potassium."[26]

This was incorrect; Cozaar is a high-blood pressure medication. "PO" simply meant that the medication had to be administered orally. LaRue, therefore, asked O'Haro what she meant. O'Haro then told the patient the medication was for his "belly." Again, that was incorrect. LaRue, therefore, concluded that O'Haro was about to administer a medication without knowing its correct purpose.[27]

That constituted a major mistake. A nurse may only administer a medication if she can properly identify the medication and its therapeutic purpose. Students and nurses may find this information in the patient's chart, in pharmaceutical handbooks available at the Nurses' station, or in online pharmaceutical compendiums.[28]

LaRue, therefore, instructed O'Haro to pause and look up Cozaar's purpose before administering it to the patient.[29]

That same day, LaRue tasked O'Haro with re-constituting a medication. That involved mixing a prescribed ratio of powdered medication with saline. Once mixed, the reconstituted medication would be administered to the patient through an intravenous ("IV") device. O'Haro needed a total of 2 milliliters of reconstituted

---

[26] (*See* Statement, ¶¶ 60-65).
[27] (*See* Statement, ¶¶ 66-70).
[28] (*See* Statement, ¶¶ 71-73).
[29] (*See* Statement, ¶ 74).

medication. But when she presented the syringe to LaRue for inspection, the syringe only had 1.5 milliliters of reconstituted medication. LaRue noticed a wet spot on the counter where O'Haro had drawn the reconstituted medication into the syringe. That suggested that the missing .5 milliliters had spilled out at some point.[30]

When LaRue pointed that out, O'Haro didn't seem concerned. Instead, she asked LaRue if she could simply add another .5 milliliters of saline to make up for the medication that had spilled out. That, though, would ruin the medication's concentration.[31]

O'Haro should have known that. Nursing faculty address medication concentration during the program's very first course. O'Haro, though, was attempting to complete the program's final semester before becoming a professional nurse.[32]

That same day, O'Haro struggled with organization when administering a medication injection for another patient. Nurses must instill confidence in the patients receiving medication. That makes the entire process run smoother. As a nursing student in her final semester, O'Haro was supposed to prepare medications in a professional manner in the patient's room, explain the medication's purpose to

---

[30] (*See* Statement, ¶¶ 75-81).
[31] (*See* Statement, ¶¶ 82-86).
[32] (*See* Statement, ¶ 84).

the patient, answer any questions from the patient, and quickly administer the medication.[33]

O'Haro, however, was disorganized as she prepared the medication. Then she failed to explain the medication to the patient. When she attempted to administer the injection, the patient hesitated, then refused to let O'Haro proceed, asking for a more experienced nurse. Instead of taking charge of the situation, O'Haro simply responded, "Ok."[34]

Professor LaRue took O'Haro into the hallway and explained that her disorganization and her failure to explain the medication's purpose had likely caused the patient's lack of confidence in her abilities. When LaRue asked O'Haro how she would have handled such a situation if she had been a professional nurse, O'Haro responded that she would have asked a co-worker to administer the medication for her. LaRue felt that wasn't acceptable since it could upset allocation of duties among nursing staff.[35]

Because of these errors, Professor LaRue graded O'Haro as "not met" in the categories of "professionalism," "critical thinking," and "caring" for her clinical work that day.[36]

---

[33] (*See* Statement, ¶¶ 89-93).

[34] (*See* Statement, ¶¶ 87-90).

[35] (*See* Statement, ¶¶ 94-96).

[36] (*See* Statement, ¶ 97).

## 2.     O'Haro made significant critical thinking errors on February 13, 2015.

The next shift on February 13, 2015, marked the last day of O'Haro's medical/surgical rotation and, thus, her only opportunity to remediate the "not met" grades she received the day before.[37]

O'Haro, however, made a very significant critical thinking mistake during her shift on February 13. Specifically, O'Haro expressed hesitation about administering a prescribed heart medication to a patient whose blood pressure readings registered slightly below normal. When Professor LaRue questioned O'Haro about her hesitation, it became clear that O'Haro did not know whether the blood pressure readings were normal for this patient or whether the patient had been taking the medication at home before admission to the hospital. If the patient had been taking the medication before admission without complications, then the slightly-lower-than-normal blood pressure reading would not have justified withholding the prescribed heart medication.[38]

O'Haro's hesitation was not itself an error. As a result, Professor LaRue reviewed the patient's chart with O'Haro. That review revealed that the heart medication was not new to this patient. Rather, the patient had been taking that medication for some time. Moreover, the patient's historic blood pressure readings

---

[37] (*See* Statement, ¶ 98).
[38] (*See* Statement, ¶¶ 99-101).

indicated that the slightly-lower-than-normal blood pressure reading had been steady for some time. Finally, a review of the patient's chart indicated that the heart medication's dosage had been decreased upon the patient's admission to the hospital. All of this suggested strongly that administering the heart medication posed very little risk that the patient's blood pressure would drop to a dangerous level, especially when that risk was balanced against the heart medication's therapeutic effects.[39]

Through questioning, Professor LaRue drew all of this information out of O'Haro as the two of them reviewed the patient's chart together. Professor LaRue then asked O'Haro if she would still hold the patient's heart medication. O'Haro responded that she would still withhold the medication.[40]

Professor LaRue then had an in-depth discussion with O'Haro about the prescribed heart medication and its relationship with blood pressure. O'Haro seemed to grasp the points that Professor LaRue was making.[41]

But O'Haro wouldn't budge. When Professor LaRue asked O'Haro again if she would still hold the heart medication given the information available, O'Haro insisted that she would not administer the medication because of the patient's blood pressure reading. Professor LaRue then referred O'Haro to the hospital's

---

[39] (*See* Statement, ¶¶ 102-106).
[40] (*See* Statement, ¶¶ 107-109).
[41] (*See* Statement, ¶¶ 110-111).

bedside nurse for a second opinion. The bedside nurse agreed with LaRue and ordered O'Haro to administer the heart medication.[42]

Professor LaRue issued O'Haro a "not met" that day for "professionalism" and "critical thinking." Certainly, O'Haro's insistence on holding the heart medication was the wrong clinical decision. But the problem went far deeper than that: O'Haro had no clinical justification for refusing to administer the medication. Of course, it wasn't error for O'Haro to express concerns about the patient's blood pressure reading. Her review of the patient's chart, however, should have dispelled those concerns.[43]

Had she been a professional nurse—without the benefit of Professor LaRue's or the bedside nurse's intervention—O'Haro would have made the unilateral decision to refuse administration of a prescribed heart medication without any rational clinical reason for doing so. Professor LaRue felt that presented a patient safety concern.[44]

### 3.    Lott and LaRue gave O'Haro a final opportunity to remediate her "not met" clinical evaluations.

Professors Lott and LaRue met with O'Haro on February 18, 2015, to discuss the "not met" evaluations she had received. By that point, O'Haro's

---

[42] (*See* Statement, ¶¶ 112-114).
[43] (*See* Statement, ¶¶ 115-118).
[44] (*See* Statement, ¶¶ 119-120).

medical/surgical rotation had ended, although O'Haro still had un-remediated "not met" evaluations.[45]

Lott and LaRue, therefore, devised a plan that would provide O'Haro one last opportunity to remediate the noted concerns with her clinical performance. Specifically, O'Haro would be required to demonstrate certain basic skills under the supervision of Professor Kara Lindstrom during O'Haro's regularly-scheduled critical care placement at Hanover Hospital's Emergency Department on February 19, 2015.[46]

Under that plan, O'Haro would be required to (1) successfully administer medications utilizing the "3 checks and 7 rights of administration"[47]; (2) demonstrate critical thinking and sound reasoning skills when developing a plan of care for a patient; and (3) organize herself before approaching a patient.[48]

Lott and LaRue presented the plan to O'Haro in writing, and O'Haro signed the document.[49]

---

[45] (*See* Statement, ¶¶ 121-122).

[46] (*See* Statement, ¶¶ 123-127).

[47] The three checks and seven rights are tools to ensure safe medication administration. The seven "rights" are the following topics that the nurse must confirm: right medication; right patient; right dosage; right route; right time; right reason; and right documentation. The "three checks" means the nurse must confirm this information three times: when pulling the medication; when preparing the medication; and at the patient's bedside before administering the medication. (*See* Statement, ¶¶ 131-133).

[48] (*See* Statement, ¶ 128).

[49] (*See* Statement, ¶¶ 129-130).

**4.    O'Haro made additional errors during her final clinical rotation on February 19, 2015.**

Obviously, O'Haro had a lot riding on her performance at Hanover Hospital on February 19, 2015. She apparently knew that. She reported hours earlier than required and was in tears as the evening shift began.[50]

Professor Lindstrom noticed this and tried to alleviate O'Haro's anxiety. Before requiring her to perform any clinical tasks, Professor Lindstrom assigned O'Haro to observe nurses performing triage in the hospital's emergency department. Lindstrom felt that would calm O'Haro before evaluating her clinical skills.[51]

After those observations, Professor Lindstrom started O'Haro with something she figured would be easy. A patient had presented with what appeared to be diabetes-related complications. Professor Lindstrom knew that HACC's Nursing students study diabetes and its complications during the program's first semester and throughout the remaining semesters. Professor Lindstrom thought that asking O'Haro to articulate a plan of care for a diabetic patient would be something of a softball for her.[52]

O'Haro, however, didn't respond when asked to articulate such a plan of care. So Lindstrom asked O'Haro what tests she should order for such a patient.

---

[50] (*See* Statement, ¶¶ 134-136).
[51] (*See* Statement, ¶¶ 137-138).
[52] (*See* Statement, ¶¶ 139-141).

18

O'Haro, though, could not respond with anything more concrete than "blood work."[53]

Again, O'Haro was in the final semester of the Nursing program. Lindstrom, therefore, expected O'Haro—at the very least—to request a complete blood cell count and glucose levels for such a patient. O'Haro, though, appeared unable to articulate that.[54]

At some point that same evening, O'Haro made a patient safety error related to administering Valium through an IV. Specifically, Professor Lindstrom instructed O'Haro to administer 5 milligrams of Valium to the patient and asked O'Haro how fast the medication should be pushed through the IV. Without consulting any pharmaceutical resources—or even requesting to do so—O'Haro said, "Three to five minutes."[55]

That was incorrect. A Valium push must be administered at a rate of 5 milligrams per minute. So a 5 milligram dose should be administered in one minute. When Professor Lindstrom asked if she was sure about the timing, O'Haro blurted out, "Yes"—again without consulting any pharmaceutical resources.[56]

Naturally, nurses are not walking pharmaceutical encyclopedias. Accordingly, Professor Lindstrom informed students at the shift's start that she

---

[53] (*See* Statement, ¶¶ 142-144).
[54] (*See* Statement, ¶ 145).
[55] (*See* Statement, ¶¶ 146-147).
[56] (*See* Statement, ¶¶ 148-149).

would help them access a computer if they needed to look up any medications
online.[57]

O'Haro, though, did not ask for such assistance. Instead, she insisted that she
knew the correct rate for administering Valium through an IV without looking it
up. And, quite importantly, she was wrong.[58]

Regardless, the error turned out to be harmless. The treating physician
canceled the medication order before the Valium could be administered. As a
result, Professor Lindstrom didn't hold O'Haro's hubris against her.[59]

O'Haro, though, made other errors when administering medication to a
different patient that same evening. That medication order required O'Haro to
administer a "bolus dose" of a medication called Heparin through the patient's IV.
A bolus dose is simply a quantity of fluid or medication administered through a
syringe at a controlled, rapid rate. Nurses use a bolus dose to increase a
medication's effects or therapeutic levels.[60]

At first, O'Haro struggled to calculate the correct dosage for the medication.
During that process, O'Haro calculated the dosage three times and came up with
three different answers. She appeared confused and didn't know which of her three
calculations was correct. Eventually, a nurse on duty intervened to provide O'Haro

---

[57] (*See* Statement, ¶ 150).
[58] (*See* Statement, ¶ 151).
[59] (*See* Statement, ¶¶ 152-153).
[60] (*See* Statement, ¶¶ 154-156).

with the correct dosage. Dosage calculation is a task students learn during the Nursing program's first semester. Students in their final semester—as O'Haro was during the 2014-15 academic year—are expected to calculate a bolus dose and its infusion rate.[61]

Even after she received the correct dosage calculation from the hospital nurse, O'Haro struggled to pull the correct amount of medication into the syringe. According to Lindstrom, O'Haro didn't appear to understand what the measurement marks on syringe represented.[62]

Then, once Professor Lindstrom had approved O'Haro to administer the medication, O'Haro told the patient that she was going to administer the medication in her abdomen.[63]

That would have been the incorrect route. Had O'Haro simply consulted the medication order—as required—she would have seen that she had to administer the bolus through the IV device in the patient's arm. Again, "right route" is one of the "three checks and seven rights" of medication administration.[64]

Professor Lindstrom stopped O'Haro before she could administer the medication in the patient's abdomen. Lindstrom instructed O'Haro to come back

---

[61] (*See* Statement, ¶¶ 157-161).

[62] (*See* Statement, ¶¶ 162-163).

[63] (*See* Statement, ¶ 164).

[64] (*See* Statement, ¶¶ 165-166).

over to the computer—where Lindstrom was standing—to verify the medication order. O'Haro told Lindstrom that she knew what the correct route was.[65]

But O'Haro went back over toward the patient as the patient lifted her gown to expose her abdomen. O'Haro did not correct the patient by indicating that the medication would actually be administered through the IV. Instead, O'Haro advanced toward the patient with the syringe in her hand.[66]

At that point, Professor Lindstrom feared that O'Haro was about to insert the syringe into the patient's abdomen. She called to O'Haro again and made her approach the computer a second time. Using the computer's cursor, Professor Lindstrom circled the route on the medication order, which indicated that the medication had to be administered through the patient's IV. O'Haro said, "I know" and then told the patient that the medication would be administered through the IV. O'Haro then administered the medication through the patient's IV.[67]

Lindstrom feared that, had she not intervened, O'Haro would have inserted the syringe in the patient's abdomen without consulting the medication order on the computer.[68]

Because of these errors, Professor Lindstrom informed Lott and LaRue that O'Haro had not satisfied the conditions required to remediate the "not met"

[65] (*See* Statement, ¶¶ 167-168).
[66] (*See* Statement, ¶¶ 170-172).
[67] (*See* Statement, ¶¶ 173-176).
[68] (*See* Statement, ¶ 177).

evaluations she had received previously. Additionally, Lindstrom rated O'Haro as "not met" in the categories of "professionalism" and "clinical problem solving" for the final clinical shift for Nursing 250.[69]

Because O'Haro had failed to remediate the concerns noted in her action plan, she received a failing grade for her clinical performance in Nursing 250. That automatically resulted in O'Haro failing Nursing 250, regardless of the outcome of the course's theory component.[70]

The failing grade for Nursing 250 marked the second failing grade O'Haro had received in the program. Accordingly, the Nursing faculty removed her from the program.[71]

O'Haro filed an appeal challenging the grade. But HACC's Appeals of Academic Decisions Committee unanimously upheld the failing grade.[72]

D.    O'Haro has not become a registered nurse since her removal from HACC's program.

O'Haro hasn't gone on to become a registered nurse since HACC removed her from its program almost five years ago. As mentioned earlier, she could have enrolled in HACC's Practical Nursing program, with advanced standing based on the courses she had already passed. And if she had successfully completed the

---

[69] (*See* Statement, ¶¶ 178-179).

[70] (*See* Statement, ¶¶ 180-183).

[71] (*See* Statement, ¶ 184).

[72] (*See* Statement, ¶¶ 185-186).

Practical Nursing program and passed the Practical Nurse licensing exam, she could have been re-admitted to HACC's Registered Nurse program with credit for the Nursing courses she had already successfully completed. Instead of availing herself of those opportunities, O'Haro focused on trying to obtain admission to an associate degree program at a different institution.[73]

Specifically, O'Haro has attempted to enroll in the Nursing program at Hagerstown Community College—the same program she failed out of 18 years ago. Hagerstown Community College, however, required that O'Haro take an entrance exam—called the Test of Essential Academic Skills, or "TEAS Exam"— before agreeing to admit her. Nursing programs around the country use this exam to measure whether applying students have the necessary core academic skills to complete demanding Nursing programs.[74]

O'Haro has taken the TEAS exam at least five times since her removal from HACC's program. Each time, her score has fallen well short of that required for admission to Hagerstown's program. Although HACC didn't require students to take the TEAS test when it admitted O'Haro to its program, HACC now requires that. HACC's required score is even higher than Hagerstown's.[75]

---

[73] (*See* Statement, ¶¶ 190-192).
[74] (*See* Statement, ¶¶ 192-194).
[75] (*See* Statement, ¶¶ 195-202).

In other words, O'Haro's TEAS scores would not have permitted her to be

admitted to HACC's Nursing program if she attempted to apply now.

## IV.    STATEMENT OF QUESTIONS INVOLVED

1.    Whether O'Haro has adduced evidence that, if believed, would
      establish that HACC removed her from the Nursing program based on
      her race or national origin?

      **Suggested Answer:** No.

2.    Whether O'Haro has adduced evidence that, if believed, would
      establish that HACC retaliated against her?

      **Suggested Answer:** No.

3.    Whether the Court should strike O'Haro's back pay claim?

      **Suggested Answer:** Yes.

## V.    LEGAL STANDARD: RULE 56 MOTION FOR
## SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is

appropriate if the record evidence establishes that "there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of

law." Although genuine disputes of material fact must be resolved in favor of the

party opposing the motion, "when the moving party has carried its burden under

Rule 56(c), its opponent must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith

Radio Corp.*, 475 U.S. 574, 586 (1986). "The very mission of the summary

judgment procedure is to pierce the pleadings and assess the proof in order to see

whether there is a genuine need for trial." Fed. R. Civ. P. 56 Advisory Committee's

Notes.

As explained below, the material facts in this case establish that HACC is

entitled to summary judgment.

## VI.   ARGUMENT

A.   O'Haro cannot establish a *prima facie* case of race or national origin
     discrimination.

O'Haro claims that HACC violated 42 U.S.C. § 1981 by dismissing her

from the College's Nursing program based on her race or her national origin. The

Third Circuit applies the *McDonnell Douglas* burden-shifting framework to claims

under § 1981. *See Jones v. School Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.

1999). Under that framework, the plaintiff must first establish a *prima facie* case of

discrimination through evidence that (1) she belongs to a protected class, (2) she

was qualified for the position, (3) she was dismissed from the program despite her

qualifications, and (4) the dismissal occurred under circumstances sufficient to

raise an inference of discrimination. *See Miller v. Thomas Jefferson Hosp.*, 908 F.

Supp.2d 639, 650 (E.D. Pa. 2012).

Although O'Haro is certainly a member of a protected class based on her

race and national origin, she cannot satisfy her *prima facie* burden because she was

not qualified to remain in HACC's program after she failed Nursing 250 during the

Spring of 2015. That marked the second time she had failed a program course. HACC's program guidelines required the removal of any student who failed two program courses.[76] Thus, O'Haro wasn't qualified to continue in HACC's Nursing program after she failed Nursing 250. *See Ke v. Drexel Univ.*, Civil Action No. 11-6708, 2015 WL 5316492 at *19 (E.D. Pa. Sept. 4, 2015) (holding student not qualified based on evidence that student was dismissed in compliance with program requirements).

O'Haro does not challenge the failing grade she received in Nursing 206 during the Fall 2014 semester, nor could she. O'Haro failed the theory portion of Nursing 206 by a significant number of points.

Instead, O'Haro claims that the Nursing faculty's evaluation of her clinical performance in Nursing 250 was purely subjective. According to her, she was performing just fine, but the Nursing faculty wrongly assessed her performance as unsatisfactory.

As an initial matter, there is nothing wrong with subjective evaluations, particularly in academic fields related to medicine. As the Supreme Court has held, academic evaluation of whether a student has "the necessary clinical ability to perform adequately as a medical [professional] . . . is by its nature more subjective

---

[76] (*See* Statement, ¶15).

27

and evaluative" than a typical disciplinary decision. *University of Missouri v. Horowitz*, 435 U.S. 78, 90 (1978).

Moreover, a federal lawsuit "is not the appropriate forum in which to . . . evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require an expert evaluation of the cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp.3d 90, 135 (D.D.C. 2014) (quotation omitted) (granting summary judgment to claim based on allegation that professors contrived clinical criticisms of the plaintiff).

Instead, faculty determinations regarding "genuinely academic decision[s]" are entitled to "great respect for the faculty's professional judgment." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985). As a result, faculty determinations regarding academic performance cannot be overridden "unless [the challenged decision] is such a departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgement." *Id.*

Because O'Haro has not adduced any evidence suggesting that the faculty's evaluation of her performance deviated from accepted academic norms in the Nursing field, there is no basis for determining that O'Haro was qualified to

28

remain in the Nursing program. As a result, O'Haro has not satisfied her *prima facie* burden. *See, e.g., Manning v. Temple Univ.*, No. Civ.A. 03-4012, 2004 WL 3019230 at *6 (E.D. Pa. Dec. 30, 2004) (holding that nursing student removed in accordance with program requirements cannot establish that she was qualified to continue in the program) *aff'd* 157 Fed. Appx. 509, 514 (3d Cir. 2005).

B.   O'Haro cannot establish pretext.

   **1.   O'Haro's denials don't establish pretext.**

Even if the Court were to find that O'Haro could satisfy her *prima facie* burden, that would not end the Court's analysis. Instead, the burden would simply switch to the College to articulate a legitimate, non-discriminatory reason for removing O'Haro from the program.

HACC can satisfy this "relatively light" burden based on the evidence that its program guidelines required the removal of any student who failed two courses, as O'Haro had. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

Accordingly, the burden switches back to O'Haro, who may avoid summary judgment by one of two ways. O'Haro could offer evidence from which a reasonable fact finder could either "(1) disbelieve the [College's] articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not . . . the motivating or determinative cause of the [College's] action."

*Underwood v. La Salle Univ.*, Civil Action No. 07-144, 2007 WL 4245737 at \*8
(E.D. Pa. Dec. 3, 2007) (quoting *Fuentes*, 32 F.3d at 764-65).

O'Haro apparently claims that a fact finder could disbelieve HACC's stated
reasons for failing her in Nursing 250 because O'Haro denies the Nursing faculty's
descriptions of her clinical performance in that course. For example, regarding the
"not met" that Professor LaRue issued O'Haro for the medication error she made
on February 12, 2015, O'Haro disclaims responsibility for drawing up the wrong
amount of medication, she denies that any medication spilled out of the syringe,
and she denies asking LaRue whether she could just add saline to the syringe to
make up for the missing reconstituted medication.[77]

O'Haro's denials, however, are irrelevant. Even if Professors LaRue and
Lindstrom incorrectly determined O'Haro was responsible for the "not met"
evaluations she received, such erroneous conclusions would not establish pretext
"since the factual dispute at issue is whether discriminatory animus motivated"
HACC, "not whether" HACC "is wise, shrewd, prudent or competent." *Fuentes*,
32 F.3d at 765.

Thus, the question is not whether HACC correctly concluded that O'Haro
made the mistakes the faculty noted, but rather whether it was reasonable for
HACC to conclude that the "not met" evaluations were appropriate given the

---

[77] (*See* Deposition of Silvia O'Haro, attached as Exhibit 9, at 150:14 to 154:13).

information available to the relevant decisionmakers. *See Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997) (*en banc*) ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination."); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("The test is good faith belief.").

In this case, the relevant decision makers were the members of HACC's Appeals of Academic Decisions Committee, who heard O'Haro's grade appeal regarding her failing grade in Nursing 250.[78] During that process, the Committee considered O'Haro's denials and Professors LaRue's and Lindstrom's explanations regarding their evaluations.[79] The Committee found the faculty's explanations more credible than O'Haro's denials and ultimately upheld the failing grade in Nursing 250. O'Haro has provided no compelling justification for overriding that determination, particularly in light of the Supreme Court's directive that courts should afford significant deference to academic determinations. *See Ewing*, 474 U.S. at 225 n. 11 ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation.").

Put differently, O'Haro cannot establish pretext simply because the Appeals of Academic Decisions Committee believed Professors LaRue's and Lindstrom's

---

[78] (*See* Statement, ¶ 186).
[79] (*See* Statement, ¶¶ 187-189).

31

version of the events over O'Haro's denials. Because the clinical deficiencies that

LaRue and Lindstrom noted concerned subjects appropriate for Nursing faculty to

evaluate—patient safety, critical thinking, and clinical problem solving—there

would be no basis for a fact finder to determine that HACC discriminated against

O'Haro because the faculty determined she had un-remediated shortcomings in

these areas.

In summary, O'Haro's denials about her performance cannot save her claim

from summary judgment.

## 2.  O'Haro has not established that she was similarly-situated to other students who passed.

O'Haro will try to save her claims from summary judgment by claiming that

Caucasian students made similar errors but did not receive failing clinical grades.

Certainly, a plaintiff may establish a triable issue regarding pretext through

evidence that the defendant treated others outside the protected class differently

than the plaintiff. But doing so is no easy task.

In the context of employment discrimination cases, evidence of the

employer's treatment of employees outside the protected class suggests pretext

only if the plaintiff and the comparator employees were " 'similarly situated' . . .

'in all relevant respects.' " *Opsatnik v. Norfolk Southern Corp.*, 335 Fed. Appx.

220, 222-23 (3d Cir. 2009) (quoting *Holifield v. Reno*, 115 F.3d 155, 1562 (11th

Cir. 1997). "Substantial similarity" depends upon the context of each case, " 'but

often includes a showing that the [plaintiff and the comparator employees] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.' " *Cain v. WellSpan Health*, Civil Action No. 1: 08-CV-1704, 2009 WL 5112352 at *9 (M.D. Pa. Dec. 17, 2009) (quoting *Opsatnik* and *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).

When, as here, the situation involves subjective evaluation of nursing students' clinical performance, the "subjective nature of the judgement must inform the similarly-situated comparators analysis." *Reeves v. Shawnee State Univ.*, Case No. 1:16-cv-765, 2018 WL 582555 at *9 (S.D. Ohio Jan. 29, 2018) (rejecting the plaintiff's evidence regarding treatment of other students).

O'Haro claims that she was treated differently than Caucasian students because she was not permitted to remediate the noted deficiencies in HACC's Nursing Laboratory. Instead, HACC required O'Haro to remediate those concerns in the clinical setting, specifically during her final clinical rotation with Professor Lindstrom at Hanover Hospital.

This, however, does not demonstrate that HACC treated O'Haro differently than similarly-situated Caucasian students. As an initial matter, HACC's Program Handbook requires that *all students* must remedy any noted clinical deficiency in

33

the clinical setting.[80] O'Haro, though, claims that a Caucasian student, "K.E.,"
went to HACC's Nursing Laboratory to practice a clinical skill for which she
received a "not met" evaluation.

O'Haro and K.E., however, were not similarly situated. O'Haro received
"not met" evaluations from Professor LaRue during Nursing 250, one of three
"mini-mester" courses during the final semester of HACC's Nursing program.[81] In
contrast, K.E. received her "not met" evaluation during an earlier semester of the
program.[82] Moreover, O'Haro and K.E. had different professors. LaRue issued
O'Haro the "not met" evaluations in Nursing 250, while Professor Ronda Morrison
had assigned K.E. to practice the clinical skill in the Nursing Laboratory.[83] And the
clinical mistakes the two students made were entirely different. K.E. had struggled
with administering medications to two patients at once, a skill that could be
practiced in the Nursing Laboratory.[84] O'Haro, though, struggled with critical
thinking and patient safety, issues that could only be demonstrated in the clinical
setting.[85]

---

[80] (*See* Exhibit 35 ("The student must satisfactorily re-perform this behavior *in the clinical setting* to amend the clinical objective to a 'met' objective in the Clinical Performance Evaluation Tool.")).

[81] (*See* Statement, ¶¶ 97 and 115).

[82] (*See* Statement, ¶¶ 204-205).

[83] (*See* Statement, ¶ 209).

[84] (*See* Statement, ¶ 206).

[85] (*See* Statement, ¶¶ 97 and 115).

Furthermore, K.E. ended up demonstrating her mastery of the skill in the clinical setting. Admittedly, Professor Morrison assigned K.E. to practice her two-patient medication passes in HACC's Nursing Laboratory. But K.E. made her mistakes early in the course and ended up executing that skill during one or more of her remaining clinical days that semester.[86]

O'Haro also takes issue with HACC's decision to require her to remediate the concerns with her clinical performance during her final clinical assignment with Professor Lindstrom at Hanover Hospital's Emergency Department. According to O'Haro, the Emergency Department is a stressful environment, not well-suited for her to remediate the concerns that Professor LaRue had noted.

Allowing O'Haro to remediate with Professor Lindstrom, however, was a special exception provided to O'Haro, not an unfair imposition. O'Haro had incurred "not met" evaluations during her medical-surgical clinical placement with Professor LaRue. Ordinarily, students must remediate "not met" evaluations during the placement in which those evaluations occur.[87] So O'Haro should have been required to remediate her "not met" evaluations with Professor LaRue during the medical-surgical placement. O'Haro, however, had incurred "not met" evaluations during her second to last day in the medical-surgical rotation and then failed to remediate those concerns during the final medical-surgical day. O'Haro simply ran

---

[86] (*See* Statement, ¶¶ 207-208).
[87] (*See* Statement, ¶ 123).

out of time in in the medical-surgical placement to remediate her "not met" evaluations.

As a result, HACC could have just failed O'Haro based on her inability to remediate the "not met" evaluations during her medical-surgical placement.[88] But O'Haro was in her final semester of the Nursing program. Because she had failed Nursing 206 previously, failing Nursing 250 would result in her removal from the program. Furthermore, the skills that O'Haro had failed to demonstrate—developing appropriate care plans and administering medications safely—were skills that O'Haro could demonstrate in an emergency department setting.[89] Accordingly, the Nursing faculty decided to exercise its discretion to provide O'Haro one last chance to cure the noted concerns with her clinical performance.[90]

So allowing O'Haro to cure the concerns in Hanover Hospital Emergency Department does not suggest that O'Haro failed Nursing 250 because of her race or national origin. As this Court has held previously, "In an educational setting, instructors must possess discretion to assess whether students have met expectations." *Mohebi v. York Hosp.*, Civil Action No. 1:07-CV-2255, 2009 WL 648981 at *1 n. 2 (M.D. Pa. Mar. 10, 2009) (Conner, J.).

---

[88] (*See* Statement, ¶ 125).
[89] (*See* Deposition of Kara Lindstrom, attached as Exhibit 21, at 44:18 to 45:3).
[90] (*See* Statement, ¶ 126).

36

Finally, O'Haro claims that Caucasian students made the same mistakes she made but did not received "not met" evaluations for those mistakes. Again, Professors LaRue and Lindstrom issued "not met" evaluations to O'Haro for the following mistakes:

- Attempting to administer a medication without knowing its correct purpose (the Cozaar PO incident);

- Failing to reconstitute a medication properly (a syringe with 1.5 milliliters of medication, instead of 2 milliliters);

- Failing to understand the role of medication concentration (asking whether she could simply add saline to make up the missing .5 milliliters of reconstituted medication);

- Disorganized approach when administering medication and failure to explain the medication's purpose to the patient (resulting in the patient asking for a more experienced nurse);

- Insisting upon withholding a prescribed heart medication without rational clinical justification for doing so (the low blood pressure reading incident);

- Failure to verbalize an adequate plan of care for a patient with diabetes-related complications (during the final placement with Professor Lindstrom);

- Failure to calculate the correct dosage for a medication (when administering the bolus dose under Professor Lindstrom's supervision);

- Struggling to pull the correct amount of medication into a syringe (again, under Professor Lindstrom's supervision); and

- Attempting to administer a medication using the wrong route (when she attempted to administer the bolus dose in the patient's abdomen instead of the patient's IV).

O'Haro relies on the testimony of "T.L.," a Caucasian student who took Nursing 206 with O'Haro.[91] More specifically, O'Haro relies upon a written statement that T.L. provided to O'Haro in March of 2015, which purports to describe certain incidents involving Caucasian students during Nursing 206 in the Fall 2014 semester. During her deposition, T.L. testified that she had no independent recollection of any of these alleged incidents or their aftermaths, other than two incidents that involved T.L. herself and another incident that involved Caucasian student "H.R."[92]

Regardless, T.L.'s statement is irrelevant because, most notably, it doesn't establish that O'Haro and the Caucasian students were similarly-situated. As an initial matter, none of the incidents mentioned in the statement involved Professor Lindstrom.[93] Obviously, the treatment the Caucasian students received from other professors doesn't suggest that O'Haro's race or national origin played any role in Professor Lindstrom's evaluation of O'Haro performance on February 19, 2015.

Certainly, some of the issues that T.L.'s statement addresses ostensibly occurred under Professor LaRue's supervision. But none of those situations mirror

---

[91] (*See* T.L.'s March 20, 2015, Written Statement, attached as Exhibit 40).
[92] (*See* Deposition of T.L., attached as Exhibit 41, at 38:9-23).
[93] (*See* T.L. Depo., Ex. 41, at 47:1-10).

the events that led LaRue to issue "not met" evaluations to O'Haro. For example,

T.L.'s statement alleges that Caucasian student "E.G." did not receive a "not met"

when she drew up medications outside Professor LaRue's presence.[94] O'Haro,

however, did not receive a "not met" for doing that.[95] Similarly, T.L. claims that

Caucasian student "K.M." allegedly drew up a medication but before administering

it determined that the medication order had been changed. As a result, the

medication she had drawn up had to be "wasted."[96] O'Haro, though, never received

a "not met" for wasting medication. Certainly, the incident involving the

reconstituted medication on February 12, 2015, resulted in the medication having

to be "wasted." But the errors LaRue issued "not met" evaluations for related to

O'Haro claiming that she could simply add saline to make up for the reconstituted

medication that had spilled when O'Haro improperly drew the medication into the

syringe.[97] That is entirely different from simply "wasting" medication.[98]

The closest issue that T.L.'s statement addresses is the situation involving

student "H.R." T.L.'s statement alleges that H.R. gave a heart medication to a

patient whose heart rate had fallen below guidelines for safe medication

---

[94] (*See* T.L.'s Written Statement, Ex. 41, at p. 1).
[95] (*See* Statement, ¶ 210).
[96] (*See* T.L.'s Written Statement, Ex. 41, at p. 1).
[97] (*See* Deposition of Caren LaRue, attached as Exhibit 3, at 151:12 to 152:19; 206:10-14).
[98] (*See* Affidavit of Caren LaRue, attached as Exhibit 1, at ¶¶ 55-58).

administration. T.L.'s statement claims that this caused the patient's heart rate to drop, which—T.L. claims—resulted in the patient's transfer to critical care.[99]

Professor LaRue, however, testified that T.L.'s belief about what happened during that incident is incorrect. Certainly, the patient fainted and had to be transferred to critical care.[100] Likewise, it is beyond dispute that "H.R." felt she was responsible for that.[101] But the event involved a drop in blood pressure; it had nothing to do with the patient's heart rate.[102]

More importantly, LaRue investigated the incident and determined that H.R.'s administration of the prescribed medication did not contribute to the patient's blood pressure dropping. Moreover, the hospital's bedside nurse had ordered H.R. to administer the medication, and the treating cardiologist expressed no concerns about H.R. following the bedside nurse's direction.[103] As a result, LaRue determined that H.R. did not commit an unsafe nursing practice and, therefore, did not issue H.R. a "not met" evaluation.[104]

Absent evidence that LaRue's evaluation of H.R.'s performance that day constituted a substantial "departure from accepted academic norms," H.R.'s situation does not suggest that O'Haro's or H.R.'s races played any role in LaRue's

---

[99] (*See* T.L.'s Written Statement, Ex. 40, at p. 1).
[100] (*See* LaRue Depo., Ex. 3, at 101:14 to 103:10 and 187:25 to 188:6).
[101] (*See id.* at 189:15-20).
[102] (*See id.* at 102:21 to 103:3).
[103] (*See id.* at 103:22 to 104:17 and 211:14 to 212:21).
[104] (*See id.* at 189:1 to 191:13).

evaluation of their performances. *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225 (1985).

Finally, there is T.L.'s allegation that HACC faculty permitted Caucasian student "L.F." to remediate a clinical "not met" in the Nursing Laboratory after the last day of class in Nursing 206 during the Fall 2014 semester. The Nursing faculty deny that,[105] and T.L. has admitted that she did not witness that. Instead, L.F. told her that is what occurred.[106] T.L.'s statement regarding L.F., therefore, constitutes inadmissible hearsay. *See* Fed. R. Evid. 801(c) (" 'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) the party offers in evidence to prove the truth of the matter asserted in the statement.").

Absent confirmatory testimony from L.F., T.L.'s statement about what L.F. told her is insufficient to create a genuine dispute of fact requiring a trial. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.").

Even if admissible, the evidence would be of almost no probative value. After all, L.F. failed Nursing 206. So if HACC faculty permitted her to remediate

---

[105] (*See, e.g., id.* at 115:10 to 117:16).
[106] (*See* T.L. Depo., Ex. 41, at 50:24 to 51:1 ("Q: How do you know she was able to remediate in the skill in the lab? A: Because she told me.")).

41

in the laboratory after the course ended—which HACC denies—that did not aid L.F. in passing that course.[107]

O'Haro's evidence regarding the Caucasian students—including L.F. and H.R.—suffers from a more fundamental defect: It fails to demonstrate that HACC's faculty harbored the same level of concerns regarding any Caucasian students as they did with O'Haro's performance. So even if the fact finder could determine that the faculty voiced some of the same concerns regarding certain Caucasian students, there is no evidence in the record suggesting that HACC had the same level of concerns with any Caucasian student but nonetheless let that student pass.

As a result, O'Haro's evidence is insufficient to create a genuine dispute of fact requiring a trial. *See Ke v. Drexel Univ.*, Civil Action No. 11-6708, 2015 WL 5316492 at *19 (E.D. Pa. Sept. 4, 2015) (holding that "any comparator for purposes of establishing that Drexel treated similarly situated students differently must have similar academic records to Plaintiff and have engaged in the same conduct without differentiating or mitigating circumstances").

C.      O'Haro cannot prove that HACC retaliated against her.

O'Haro has also alleged that HACC removed her from the Nursing Program in retaliation for her lodging internal complaints accusing certain HACC professors

---

[107] (*See* L.F.'s Academic Transcript, attached as Exhibit 42 (listing a "D" grade for N206 in the Fall 2014 semester).

of discrimination. Again, however, HACC's program guidelines required the removal of any student who had failed two courses, as O'Haro had.[108] This program requirement stands as a legitimate, non-retaliatory justification. As with her discrimination claim, O'Haro cannot demonstrate that HACC's stated reasons for removing her from the program are pretexts for retaliation. *See supra* at Part VI.B.

Accordingly, HACC is also entitled to summary judgment on O'Haro's retaliation claim.

D.      O'Haro's back pay claim must be stricken.

In the unlikely event the Court determines that O'Haro has presented a triable issue of discrimination or retaliation, the Court must nonetheless strike her claim for damages. O'Haro seeks back pay equal to the amount of money she claims she would have earned as a registered nurse had she passed Nursing 250 during the Spring 2015 semester.[109]

Granted, a successful plaintiff under 42 U.S.C. § 1981 is entitled to recover back pay. That, however, is an equitable remedy to be decided by the Court. *See Donlin v. Philips Lighting North America Corp.*, 581 F.3d 73, 78 n. 1 (3d Cir.

---

[108] (*See* Statement, ¶ 15).

[109] (*See* Second Amend. Compl. (Doc. 17) at Prayer for Relief, p. 11 (requesting an order requiring HACC to "pay to Ms. O'Haro the difference between what she has eared since the date of dismissal from the nursing program through the date of the judgment and what she could have earned during that period as an RN")).

2009) (holding that "back pay and front pay are equitable remedies to be determined by the court").

Furthermore, the plaintiff bears the burden of proving that the defendant's conduct has caused the damages for which she seeks recompense. Such "damages cannot be based on sheer speculation." *Dawn L. v. Greater Johnstown Sch. Dist.*, 586 F. Supp.2d 332, 385 (W.D. Pa. 2008) (citation omitted).

In the present case, O'Haro's claim for lost wages as a registered nurse is entirely speculative. Even if O'Haro had passed Nursing 250, she had a number of other steps to satisfy before becoming a registered nurse. Specifically, she still had to pass both the theory and clinical components of Nursing 251 and Nursing 243.[110] Even then, she still had to pass the NCLEX, the registered nursing licensing exam.[111]

Moreover, O'Haro has neither obtained a nursing degree nor become a registered nurse during the almost five years since she failed Nursing 250. Although O'Haro has tried to enroll at Hagerstown Community College, she has been unable to attain a sufficient score on that college's entrance exam in five attempts.[112] Given all this, the Court could not conclude that Professor LaRue's and Lindstrom's evaluations of her clinical performance are all that stood between

---

[110] (*See* Statement, ¶¶ 43-44).
[111] (*See* Statement, ¶ 4).
[112] (*See* Statement, ¶¶ 192-200).

O'Haro and the wages she would have earned as a registered nurse over the past half-decade.

O'Haro has also failed to appropriately mitigate her damages. A successful discrimination plaintiff is obligated to mitigate her damages by using "reasonable diligence to obtain substantially equivalent employment." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 864 (3d Cir. 1995). If, as O'Haro claims, HACC caused her to lose the wages associated with employment as a registered nurse, then O'Haro was required to at least explore other available avenues for achieving that goal.

O'Haro had such an avenue available to her. As stated at the outset, upon removal from HACC's Registered Nurse associate degree program she could have applied for admission to HACC's Practical Nurse certificate program, with advanced standing for the courses she had already completed in the associate degree program. Had she successfully completed that program, she could have begun to earn higher wages as a practical nurse. She could have also applied for re-admission to HACC's Registered Nurse associate degree program, again with advanced standing based on the courses she had passed before her removal. O'Haro did not take advantage of these opportunities.[113] Accordingly, she cannot blame her alleged wage loss on HACC.

The Court, therefore, should strike O'Haro's request for lost wages.

---

[113] (*See* Statement, ¶ 191).

45

## VII.   CONCLUSION

HACC is entitled to summary judgment on O'Haro's claims of discrimination and retaliation. HACC had legitimate academic reasons for removing O'Haro from the Registered Nurse associate degree program. O'Haro has adduced no admissible evidence that, if believed, would establish that HACC removed her from the program based on her race, her national origin, or any protected conduct. Additionally, O'Haro's claim for lost wages is entirely speculative, and O'Haro has failed to mitigate her alleged wage loss.

Accordingly, HACC requests that the Court enter an order granting summary judgment in its favor. Alternatively, HACC requests that the Court enter an order striking O'Haro's claim for back pay.

Respectfully Submitted,

BARLEY SNYDER, LLP

/s/ David J. Freedman
David J. Freedman, Esq. (Pa. Bar No. 207257)
dfreedman@barley.com
Kareemah Mayer, Esq. (Pa. Bar No. 326031)
kmayer@barley.com
Barley Snyder, LLP
126 East King Street
Lancaster, PA 17602-2893
Tel:  (717) 299-5201
Fax: (717) 291-4660
Attorneys for Defendant Harrisburg Area
Community College

46

## **WORD COUNT CERTIFICATION**

I, David J. Freedman, hereby certify that the word count function for this document indicates that the document contains 9,622 words—not counting the cover sheet, table of contents, table of authorities, word count certification, and certificate of service.

BARLEY SNYDER, LLP

*/s/ David J. Freedman*
David J. Freedman, Esq. (Pa. Bar No. 207257)
dfreedman@barley.com
Kareemah Mayer, Esq. (Pa. Bar No. 326031)
kmayer@barley.com
Barley Snyder, LLP
126 East King Street
Lancaster, PA 17602-2893
Tel:  (717) 299-5201
Fax: (717) 291-4660
*Attorneys for Defendant Harrisburg Area*
*Community College*

47

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this 1st day of November, 2019, a true and correct copy of the foregoing, Defendant Harrisburg Area Community College's Brief in Support of Its Motion for Summary Judgment, has been filed with the Court's CM/ECF system and is available for downloading:

Sara A. Austin, Esq.
Austin Law Firm LLC
226 E. Market St.
York, Pa 17403
(717) 846-2246
saustin@austinlawllc.com


BARLEY SNYDER, LLP

*/s/ David J. Freedman*
David J. Freedman, Esq. (Pa. Bar No. 207257)
dfreedman@barley.com
Kareemah Mayer, Esq. (Pa. Bar No. 326031)
kmayer@barley.com
Barley Snyder, LLP
126 East King Street
Lancaster, PA 17602-2893
Tel:  (717) 299-5201
Fax: (717) 291-4660
*Attorneys for Defendant Harrisburg Area*
*Community College*

48

## Appendix A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
_____

| | | |
|---|---|---|
| SILVIA M. O'HARO, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO 1:18-CV-2073 |
| v. | : | |
| | : | Honorable Christopher C. Conner |
| HARRISBURG AREA COMMUNITY | : | |
| COLLEGE | : | |
| | : | |
| Defendant | : | |

## INDEX OF UNREPORTED CASES

1. *Cain v. WellSpan Health*,
   Civil Action No. 1: 08-CV-1704, 2009 WL 5112352 (M.D. Pa.
   Dec. 17, 2009)

2. *Ke v. Drexel Univ.*,
   Civil Action No. 11-6708, 2015 WL 5316492 (E.D. Pa. Sept. 4,
   2015)

3. *Manning v. Temple Univ.*,
   No. Civ.A. 03-4012, 2004 WL 3019230 (E.D. Pa. Dec. 30, 2004)
   *aff'd* 157 Fed. Appx. 509 (3d Cir. 2005)

4. *Mohebi v. York Hosp.*,
   Civil Action No. 1:07-CV-2255, 2009 WL 648981 (M.D. Pa. Mar.
   10, 2009) (Conner, J.)

5. *Reeves v. Shawnee State Univ.*,
   Case No. 1:16-cv-765, 2018 WL 582555 (S.D. Ohio Jan. 29, 2018)

6. *Underwood v. La Salle Univ.*,
   Civil Action No. 07-144, 2007 WL 4245737 (E.D. Pa. Dec. 3,
   2007)