IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| SILVIA M. O'HARO, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO 1:18-CV-2073 |
| v. | : | |
| | : | Honorable Christopher C. Conner |
| HARRISBURG AREA COMMUNITY | : | |
| COLLEGE | : | |
| | : | |
| Defendant | : | |

_____

## DEFENDANT HARRISBURG AREA COMMUNITY COLLEGE'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendant Harrisburg Area Community College, by counsel, and in accordance with Local Rule 56.1, states the following undisputed material facts in support of its Motion for Summary Judgment:

## Background

1.    Defendant Harrisburg Area Community College is a community college with over 50,000 students enrolled at the College's five campuses and through its online component. (*See* Plaintiff's Second Amended Complaint (Docket Entry ("Doc.") 17) at ¶ 2, attached as Exhibit 1).

2.    HACC's Registered Nursing program provides qualified students the opportunity to earn an associate degree. (*See* Affidavit of Caren LaRue, attached as Exhibit 1, at ¶ 4).

3.      Upon earning that degree, students are eligible to sit for the National Council Licensure Examination, which is commonly referred to as the "NCLEX exam. (*See* LaRue Aff., Ex. 1, at ¶ 5).

4.      Students cannot become licensed registered nurses without both passing a state-approved associate degree program (like HACC's) and the NCLEX exam. (*See id.* at ¶ 6).

5.      Each Nursing course in HACC's program features a combination of classwork learning and real-life clinical experiences. (*See* LaRue Aff., Ex. 1, at ¶¶ 8-9; *see also* Associate Degree Nursing Program Graduation Requirements, attached as Exhibit 2 (listing required courses)).

6.      To pass a particular course, students must satisfactorily complete both the theory and clinical components of that course during the same semester. (*See* Deposition of Caren LaRue, attached as Exhibit 3, at 208:9-17; *see also* Associate Degree Nursing Program Graduation Requirements, Ex. 2).

7.      In the classroom phase—what HACC faculty call "the theory component"—students receive academic training, which the faculty test through written examinations, quizzes, and assignments. (*See* LaRue Aff., Ex. 1, at ¶ 9).

8.      For theory, this means the student must achieve an overall average of at least 75% on written exams. (*See* Associate Degree Academic Progression, attached as Exhibit 4 ("A theory grade of 'C' (75%) or above in nursing courses . .

. must be earned in order to progress to the next nursing course, and to graduate from the Nursing Program.")).

9.      During the courses' clinical components, students obtain real-life experience treating patients at health care facilities under the direction and supervision of licensed practitioners. (*See* LaRue Aff., Ex. 1, at ¶ 10).

10.     As a student progresses through the program, skills increase in complexity until the student demonstrates sufficient proficiency to transition safely into professional practice. (*See id.* at ¶ 11).

11.     Along the way, the student learns and practices required skills in the program's nursing laboratory. (*See id.* at ¶ 12).

12.     The faculty then validate the student's performance while the student treats patients in clinical settings. (*See id.* at ¶ 13).

13.     Students must meet all clinical evaluation criteria to complete each course's clinical component. (*See* Associate Degree Academic Progression, Ex. 4 ". . . [A]n 'M' (met) in the clinical component must be earned in order to progress to the next nursing course, and to graduate from the Nursing Program.")).

14.     Additionally, students must maintain at least a 2.0 overall grade point average to continue in the program from one semester to the next. (*See id.*).

15.     During the 2014-15 academic year, any student who failed two Nursing program courses would be removed from the associate degree program.

3

(*See* HACC's Readmission Procedure, attached as Exhibit 5, at Bates No. D46 ("A student with **two failures . . . from the same nursing program will not be eligible for readmission to that program.**" (emphasis in original); *see also* LaRue Depo., Ex. 3, at 201:2-9).

16.     Such a student, however, would be permitted to enroll in HACC's Practical Nursing certificate program. (*See* HACC's Readmission Procedure, Ex. 5; *see also* LaRue Depo., Ex. 3, at 184:9 to 186:1).

17.     Upon attaining that certificate and passing the Practical Nurse licensing exam, the student would be eligible for re-admission to the associate degree program, with credit given for courses previously passed. (*See* HACC's Readmission Procedure, Ex. 5; *see also* LaRue Depo., Ex. 3, at 184:9 to 186:18).

18.     Almost a decade before she began HACC's program, O'Haro enrolled in the Nursing program at Hagerstown Community College in Maryland. (*See* O'Haro's Transcript from Hagerstown Community College, attached as Exhibit 6).

19.     In May of 2001, she failed out of that program with a 1.6 grade point average.  (*See* May 25, 2001, Letter from Hagerstown Community College, attached as Exhibit 7).

20.     In the Spring of 2013, O'Haro enrolled in HACC's Nursing program at the College's Gettysburg Campus. (*See* Second Amend. Comp. (Doc. 17) at ¶ 7).

21.    The clinical faculty had concerns regarding O'Haro's performance during the early courses in the Nursing Program. (*See* LaRue Aff., Ex. 1, at ¶ 37).

22.    O'Haro, however, earned passing grades during the first three semesters of HACC's Nursing Program. (*See* O'Haro Academic Transcript, attached as Exhibit 8).

### O'Haro failed Nursing 206 during the Fall 2014 semester.

23.    For the Fall 2014 semester, O'Haro enrolled in Nursing 206. (*See* Deposition of Silvia O'Haro, attached as Exhibit 9, at 80:16-18; *also see* Academic Transcript, Ex. 8).

24.    At that time, Nursing 206 was the final course in the associate degree program. (*See* O'Haro Depo., Ex.9, at 80:16-22).

25.    Nursing 206 was a nine-credit, semester-long course. (*See* Nursing 206 Syllabus, attached as Exhibit 10, at Bates No. D959 ("Credit Allotment – 9 credit hours")).

26.    To pass Nursing 206, students had to successfully complete clinical rotations relating to acute care, medical/surgical care, pediatric medicine, and critical care. (*See id*.).

27.    During these clinical rotations, faculty tasked students with administering care and completing related documentation similar to what would be required of them as professional nurses. (*See* LaRue Aff., Ex. 1 at ¶ 14).

28.     One of the most important requirements of Nursing 206's clinical component involved evaluating students' application of critical thinking skills. (*See id.* at ¶ 18).

29.     Nurses don't simply take orders and administer medication without thinking. (*See id.* at ¶ 19).

30.     Instead, nurses are responsible for ensuring patients' safety and facilitating treatment outcomes. (*See id.* at ¶ 20).

31.     As a result, nurses must understand—and be able to articulate— treatment methods and the purposes of prescribed medications. (*See id.* at ¶ 21).

32.     During Nursing 206, Professor Arletta Molnar commented regarding O'Haro's performance: "Very strong concerns about Sylvia's [sic] grasp of care of the patient from a clinical perspective." (*See* O'Haro's N206 Clinical Evaluation Tool, attached as Exhibit 11, at p. 4).

33.     Another instructor, Professor Caren LaRue, noted that O'Haro "did not demonstrate…. [t]hat she knew purpose of medication. Sylvia need[s] to be able to articulate and understand medication." (*See id.* at p. 9).

34.      Professor LaRue also told O'Haro, "Your problem identification . . . is too basic for . . . N206 critical thinking." (*See id.* p.16).

35.     Professor Connie Miller provided O'Haro with detailed explanations regarding O'Haro's shortcomings in a guide to client centered care document that

O'Haro had drafted. (*See* 11/22/2014 Guide to Client Centered Care Worksheet, attached as Exhibit 12 (featuring Professor Miller's comments)).

36.     On October 9, 2014, the Nursing program's faculty leadership sent O'Haro a letter notifying her that she was in danger of failing the course's theory component. (*See* 10/09/2014 Letter, attached as Exhibit 13; *see also* LaRue Depo., Ex. 3, at 89:22 to 91:13).

37.     In follow up to that letter, Professor LaRue (the classroom instructor for Nursing 206) met with O'Haro to explain that she would need to score an 81.5% (75 points out of a total 92) on the final exam to pass Nursing 206. (*See* LaRue Depo., Ex. 3, at 91:7 to 92:6).

38.     O'Haro had averaged 72% on the course's first five exams before the final. (*See* Silvia O'Haro's N206 Grade List, attached as Exhibit 14).

39.     Professor Jill Lott, the Director for the Gettysburg Campus program at the time, also met with O'Haro to discuss her options before the final exam. (*See* Deposition of Jill Lott, attached as Exhibit 15, at 94:20 to 97:9).

40.     During that meeting, Lott explained that O'Haro still had the option of withdrawing from the course. (*See id.* at 94:22 to 95:13).

41.     Such a withdrawal would not have affected O'Haro's grade point average. (*See* Affidavit of Jill Lott, attached as Exhibit 16, at ¶ 8).

42.     HACC had already decided to change the Nursing program's curriculum at the Gettysburg Campus starting the Spring 2015 semester. (*See* Lott Depo., Ex. 15, at 93:7-14; LaRue Depo., Ex. 3, at 22:2-20).

43.     Under the new curriculum, Nursing 206 would be split into three separate "mini-mester" courses: Nursing 250, Nursing 251, and Nursing 243. (*See* LaRue Depo., Ex. 3, at 22:2-20 and 122:17 to 123:9; *see also* Lott Depo., Ex. 15, at 93:16-22).

44.     If O'Haro didn't achieve the required grade on Nursing 206's final, then she would have to pass both the clinical and theory portions in Nursing 250, Nursing 251, and Nursing 243 during the Spring 2015 semester. (*See* LaRue Depo., Ex. 3, at 122:17 to 123:9).

45.     During the meeting with Lott before the Nursing 206 final, O'Haro claimed that she felt the Nursing faculty was discriminating against her based on her race. (*See* Lott Depo., Ex. 15, at 91:25 to 93:6).

46.     Although O'Haro didn't explain the basis for that belief, Lott instructed O'Haro that such accusations must be directed to Leslie Boon, the Interim Campus Dean of Academic Affairs for the Gettysburg Campus at the time. (*See id*.).

47.     O'Haro never reported her concerns to Interim Dean Boon. (*See* O'Haro Depo., Ex. 9, at 283:7 to 283:20).

8

48.    O'Haro scored 64.5 out of 92 points on the Nursing 206 final examination. (*See* N206 Grade List, Ex. 14; *see also* LaRue Aff., Ex. 1, at ¶ 27).

49.    That score left O'Haro at least 8.5 course points short of passing Nursing 206. (*See* O'Haro Depo., Ex. 9, at 119:6-23).

50.    In the end, two other students—both Caucasian—received failing grades in Nursing 206 because of their performance in the course's theory component. (*See* LaRue Aff., Ex. 1, at ¶ 31).

51.    O'Haro did not file a grade appeal challenging the failing grade she received in Nursing 206. (*See* O'Haro Depo., Ex. 9, at 131:15-18; *see also* LaRue Aff., Ex. 1, at ¶ 30).

52.    On December 18, 2014, Professors Lott and LaRue met with O'Haro to explain her options once she failed Nursing 206. (*See* Lott Aff., Ex. 16, at ¶ 12; LaRue Aff., Ex. 1, at ¶ 32).

53.    After that meeting, O'Haro filled out the paperwork to enroll in the three "mini-mester" courses at the Gettysburg Campus during the Spring 2015 semester. (*See* O'Haro's Request for Readmission, attached as Exhibit 17).

54.    In those forms, O'Haro wrote that during the upcoming semester she intended to "study harder. Seek help on problem that is difficult. Try to prioritize school and work." (*Id.*)

55.    O'Haro, however, made no mention in these forms of having suffered any sort of discrimination during Nursing 206. (*See id*.)

**O'Haro failed Nursing 250 during the Spring 2015 semester.**

56.    O'Haro began the Spring 2015 semester with Nursing 250. (*See* O'Haro Depo., Ex. 9, at 23:23 to 24:7).

57.    Going into that course's final exam, O'Haro had a passing grade in the theory portion of Nursing 250. (*See* Defendant's Responses to Plaintiff's First Set of Requests for Admissions, attached as Exhibit 18, at Request No. 3).

58.    Professors LaRue and Connie Miller both issued O'Haro "met" evaluations during her first six clinical days in Nursing 250, meaning O'Haro had satisfied all the clinical criteria during those placements. (*See* O'Haro's N250 Clinical Evaluation Tool, attached as Exhibit 19, at Bates Nos. D793-805).

59.    On February 6, 2015, Professor LaRue praised O'Haro's work, exclaiming "Good job!" (*See id.* at Bates No. D000805).

60.    On February 12, 2015, O'Haro was scheduled to complete a medical/surgical placement at Carlisle Hospital under the direction of Professor LaRue. (*See* LaRue Aff., Ex. 1, at ¶ 39).

61.    That day, Professor LaRue tasked O'Haro with administering Cozaar PO to a patient. (*See id.* at ¶ 40; O'Haro's N250 Clinical Evaluation Tool, Ex. 19, at Bates No. D000806).

62.     When she attempted to administer Cozaar, O'Haro told the patient, "I have your PO med." (*See* LaRue Aff., Ex. 1, at ¶ 41; *see also* O'Haro Depo., Ex. 9, at 157:16 to 159:12).

63.     That statement appeared to puzzle the patient, who asked "PO?" (*See id.*).

64.     At that point, LaRue—who was in the room—instructed O'Haro to explain the medication to the patient. (*See* LaRue Aff., Ex. 1, at ¶ 43).

65.     O'Haro responded, "Cozaar—it's for your potassium." (*See id.* at ¶ 44).

66.     Cozaar is a high-blood pressure medication. (*See id.* at ¶ 45).

67.     "PO" simply meant that the medication had to be administered orally. (*See id.* at ¶ 46).

68.     LaRue, therefore, asked O'Haro what she meant. (*See id.* at ¶ 47).

69.     O'Haro then told the patient that the medication was for his "belly." (*See id.* at ¶ 48).

70.     LaRue concluded that O'Haro was about to administer Cozaar to the patient without knowing that medication's correct purpose. (*See id.* at ¶ 49).

71.     That constituted a major mistake. (*See id.* at ¶ 50).

72.     A nurse may only administer a medication if she can properly identify the medication and its therapeutic purpose. (*See id.* at ¶ 51).

73.     Students and nurses may find this information in the patient's chart, in pharmaceutical handbooks available at the Nurses' station, or in online pharmaceutical compendiums. (*See id.* at ¶ 52).

74.     LaRue, therefore, instructed O'Haro to pause and look up Cozaar's purpose before administering it to the patient. (*See* O'Haro Depo., Ex. 9, at 159:23 to 160:15).

75.     That same day, LaRue tasked O'Haro with re-constituting a medication. (*See id.*; *see also* LaRue Depo., Ex. 3, at 150:16 to 151:7).

76.     That process involved mixing a prescribed ratio of powdered medication with saline. (*See* O'Haro Depo., Ex. 9, at 151:2 to 152:7).

77.     Once mixed, the reconstituted medication would be administered to the patient through an intravenous ("IV") device. (*See* LaRue Aff., Ex. 1, at ¶ 54).

78.     O'Haro needed a total of 2 milliliters of reconstituted medication. (*See* O'Haro Depo., Ex. 9, at 156:12-16).

79.     But when O'Haro presented the syringe to LaRue for inspection, it only had 1.5 milliliters of reconstituted medication. (*See id.* at 152:9-14; *see also* LaRue Depo., Ex. 3, at 151:8 to 152:8).

80.     LaRue noticed a wet spot on the counter where O'Haro had drawn the reconstituted medication into the syringe. (*See* LaRue Depo., Ex. 3, at 151:8 to 152:8).

81.    That suggested to LaRue that the missing .5 milliliters had spilled out at some point. (*See id.* at 203:21 to 206:4)

82.    When LaRue pointed that out, O'Haro asked if she could simply add another .5 milliliters of saline to make up for the medication that had spilled out. (*See id.* at 152:9-19; 206:2-14).

83.    That, though, would ruin the medication's concentration. (*See* O'Haro Depo., Ex. 9, at 154:1-20).

84.    Nursing faculty address medication concentration during the program's very first course. (*See* LaRue Aff., Ex. 1, at ¶ 55).

85.    LaRue had to waste the medication because of O'Haro's errors. (*See* O'Haro Depo., Ex. 9, at 156:12-22).

86.    But even if the medication had not been wasted, Professor LaRue had significant concerns related to O'Haro's failure to demonstrate understanding regarding medication concentration. (*See* LaRue Aff., Ex. 1, at ¶ 57).

87.    On February 12, 2015, LaRue tasked O'Haro with administering a medication injection to a patient. (*See id.* at ¶ 59).

88.    O'Haro failed to explain the medication to this patient, even though that is a requirement for professional administration of medication. (*See id.* at ¶¶ 61-62).

89.     When O'Haro attempted to administer the medication, the patient

hesitated, then refused to let O'Haro proceed, asking for a more experienced nurse.

(*See* O'Haro Depo., Ex. 9, at 162:19-24; *see also* LaRue Depo., Ex. 3, at 157:17 to

158:7; N250 Clinical Evaluation Tool, Ex. 19, at Bates No. D000806 ("HEP SQ:

Pt. stated 'I would prefer someone with more experience to give me that.' ").

90.     O'Haro simply responded, "Ok." (*See* LaRue Aff., Ex. 1, at ¶ 65).

91.     Nurses must instill confidence in the patients receiving medication.

That makes the entire process run smoother. (*See id.* at ¶ 66).

92.     In the early semesters of the Nursing program, students must prepare

medications outside of the patient's room and under the supervision of the clinical

instructor. But by the fourth and final semester of the program, students should be

able to demonstrate professional nursing behavior by preparing medications in the

patient's room. (*See id.* at ¶ 60).

93.     As the nurse is preparing and checking the medications in the

patient's room, a fourth semester nursing student must explain the medication's

purpose to the patient, answer any questions from the patient, and quickly

administer the medication. O'Haro failed to do that. (*See id.* at ¶¶ 61-62).

94.     When the patient refused the injection from O'Haro, Professor LaRue

took O'Haro into the hallway and explained that her failure to organize the

medication before entering the room and her failure to explain the medication's

purpose had likely caused the patient's lack of confidence in her abilities. (*See id.* at ¶ 67).

95.     When LaRue asked O'Haro how she would have handled such a situation if she had been a professional nurse, O'Haro responded that she would have asked a co-worker to administer the medication for her. (*See* LaRue Depo., Ex. 3, at 207:2-12).

96.     LaRue felt that wasn't acceptable since it could upset allocation of duties among nursing staff. (*See id.* at 207:13-23).

97.     Professor LaRue graded O'Haro as "not met" in the categories of "professionalism," "critical thinking," and "caring" for her clinical rotation on February 12, 2015.  (*See* N250 Clinical Evaluation Tool, Ex. 19, at Bates Nos. D000805-D000806 (noting an "NM" evaluation for "Provide safe, clinically competent care . . . ").

98.     February 13, 2015, marked the last day of O'Haro's medical/surgical rotation. (*See* O'Haro Depo., Ex. 9, at 183:14-21).

99.     During her clinical rotation on February 13, 2015, O'Haro approached Professor LaRue regarding concerns she had about administering a prescribed heart medication to a patient whose blood pressure readings registered slightly below normal. (*See id.* at 183:22 to 185:21).

100.   When LaRue questioned O'Haro about her hesitation, it became clear that O'Haro did not know whether the blood pressure readings were normal for this patient or whether the patient had been taking the medication at home before admission to the hospital. (*See* LaRue Aff., Ex. 1, at ¶¶ 71-73).

101.   If the patient had been taking the medication before admission without complications, then the patient's slightly-lower-than-normal blood pressure reading would not have justified withholding the prescribed heart medication. (*See id.* at ¶ 74).

102.   Professor LaRue reviewed the patient's chart with O'Haro. (*See id.* at ¶ 75).

103.   That review revealed that the patient had been taking the prescribed heart medication for some time before his admission to the hospital. (*See id.* at ¶ 76).

104.   Additionally, the patient's historic blood pressure readings indicated that the slightly-lower-than-normal blood pressure reading had been steady for some time. (*See id.* at ¶ 77).

105.   Also, the heart medication's dosage had been decreased upon the patient's admission to the hospital. (*See id.* at ¶ 78).

106.   All of this suggested strongly that administering the heart medication posed very little risk that the patient's blood pressure would drop to a dangerous

level, especially when that risk was balanced against the heart medication's therapeutic effects. (*See id.* at ¶ 79).

107.    Through questioning, Professor LaRue drew all of this information out of O'Haro as the two of them reviewed the patient's chart together. (*See id.* at ¶ 80).

108.    Professor LaRue then asked O'Haro if she would still hold the patient's heart medication. (*See id.* at ¶ 81).

109.    O'Haro responded that she would still withhold the medication. (*See id.* at ¶ 82).

110.    Professor LaRue then had an in-depth discussion with O'Haro about the prescribed heart medication and its relationship with blood pressure. (*See id.* at ¶ 83).

111.    O'Haro seemed to grasp the points that Professor LaRue was making. (*See id.* at ¶ 84).

112.    But when Professor LaRue asked O'Haro again if she would still hold the heart medication given the information available, O'Haro insisted that she would not administer the medication because of the patient's blood pressure reading. (*See id.* at ¶ 85).

113.    Professor LaRue then referred O'Haro to the hospital's bedside nurse for a second opinion. (*See id.* at ¶ 84).

114.   The bedside nurse agreed with LaRue and ordered O'Haro to administer the heart medication. (*See id.* at ¶ 86).

115.   Professor LaRue issued O'Haro "not met" evaluations on February 13, 2015, in the categories of "professionalsim" and "critical thinking." (*See* N250 Clinical Evaluation Tool, Ex. 19, at Bates Nos. D000808-D000809).

116.   Professor LaRue felt that O'Haro had no clinical justification for refusing to administer the medication. (*See* February 18, 2015 Action Plan, attached as Exhibit 20 ("Issue: Clinical judgment regarding the holding of a Norvasc based on [blood pressure] 110-120/58 [heart rate] 80s without sound clinical reasoning (trends of [blood pressure, questioning if new medication or if taken at home"); *see also* LaRue Aff., Ex. 1, at ¶ 91 (noting that LaRue felt that O'Haro's conduct "presented a patient safety concern")).

117.   It wasn't error for O'Haro to express concerns about the patient's blood pressure reading. (*See* LaRue Aff., Ex. 1, at ¶ 88).

118.   O'Haro's review of the patient's chart, however, should have dispelled those concerns. (*See id.* at ¶ 89).

119.   Professor LaRue felt that if O'Haro had been a professional nurse— without the benefit of Professor LaRue's or the bedside nurse's intervention— O'Haro would have made the unilateral decision to refuse administration of a

prescribed heart medication without any rational clinical reason for doing so. (*See id.* at ¶ 90).

120.   Professor LaRue felt that presented a patient safety concern. (*See id.* at ¶ 91).

## Lott and LaRue gave O'Haro a final opportunity to remediate her "not met" clinical evaluations.

121.   Professors Lott and LaRue met with O'Haro on February 18, 2015, to discuss the "not met" evaluations she had received. (*See* LaRue Depo., Ex. 3, at 158:21-159:6).

122.   By that point, O'Haro's medical/surgical rotation had ended, although O'Haro still had un-remediated "not met" evaluations. (*See* LaRue Aff., Ex. 1, at ¶ 95).

123.   Normally, students must remediate "not met" evaluations during the placement in which those evaluations occur. (*See* LaRue Depo., Ex. 3, at 200:12-24).

124.   O'Haro, however, still had "not met" clinical evaluations when her medical/surgical rotation in Nursing 250 had ended. (*See* LaRue Aff., Ex. 1, at ¶ 95).

125.   The Nursing faculty, therefore, could have failed O'Haro due to her failure to remediate the "not met" evaluations she had received during her medical/surgical clinical rotation in Nursing 250. (*See id.* at ¶ 97).

126.    Instead, Lott and LaRue devised a plan that would provide O'Haro one last opportunity to remediate the noted concerns with her clinical performance. (*See id.* at ¶¶ 98-99; O'Haro Depo., Ex. 9, at 205:20 to 206:1).

127.    Specifically, O'Haro would be required to demonstrate specific skills under the supervision of Professor Kara Lindstrom during O'Haro's regularly-scheduled critical care placement at Hanover Hospital's Emergency Department on February 19, 2015. (*See* LaRue Aff., Ex. 1, at ¶¶ 100-101; *see also* Feb. 18, 2015 Action Plan, Ex. 20).

128.    Under that plan, O'Haro would be required to (1) successfully administer medications utilizing the "3 checks and 7 rights of administration" ; (2) demonstrate critical thinking and sound reasoning skills when developing a plan of care for a patient; and (3) organize herself before approaching a patient. (Feb. 18, 2015 Action Plan, Ex. 20).

129.    Lott and LaRue presented the plan to O'Haro in writing. (*See id.*)

130.    O'Haro signed the document. (*See id.*)

131.    The three checks and seven rights are tools to ensure safe medication administration. (*See* LaRue Aff., Ex. 1, at ¶ 103).

132.    The seven "rights" are the following topics that the nurse must confirm: right medication; right patient; right dosage; right route; right time; right reason; and right documentation. (*See id.* at ¶ 104).

133.    The "three checks" means the nurse must confirm the "seven rights" three separate times: when pulling the medication; when preparing the medication; and at the patient's bedside before administering the medication. (*See id.* at ¶ 105).

**O'Haro made additional errors during her final clinical rotation on February 19, 2015.**

134.    O'Haro reported for her critical care rotation at Hanover Hospital on February 19, 2015. (*See* O'Haro Depo., Ex. 9, at 206:2-7; 209:22-23).

135.    O'Haro reported hours before the scheduled start of her shift that evening. (*See* Affidavit of Kara Lindstrom, attached as Exhibit 22, at ¶ 7).

136.    O'Haro was in tears as the evening shift began. (*See* Deposition of Kara Lindstrom, attached as Exhibit 21, at 97:15-19).

137.    Before requiring that O'Haro perform any clinical tasks that evening, Professor Lindstrom assigned O'Haro to observe nurses performing triage in the hospital's emergency department. (*See id.* at 56:5-22).

138.    Professor Lindstrom felt that having O'Haro observe the nurses performing triage might calm O'Haro before she would be required to perform any clinical skills under evaluation. (*See id.* at 56:5-22).

139.    After O'Haro observed triage, Professor Lindstrom asked O'Haro to articulate a plan of care for a patient with what appeared to be diabetes-related complications. (*See id.* at 56:12 to 57:3).

140.    HACC's Nursing students study diabetes and its complications during the program's first semester and throughout the remaining semesters. (*See id.* at 59:13-25; *see also* O'Haro Depo., Ex. 9, at 220:14-18).

141.    Professor Lindstrom thought that asking O'Haro to articulate a plan of care for a diabetic patient would be easy for her. (*See* Lindstrom Aff., Ex. 22, at ¶¶ 8-9).

142.    O'Haro, however, didn't respond when asked to verbalize a plan of care. (*See* Lindstrom Depo., Ex. 21, at 57:4-6).

143.    To fill the void, Lindstrom asked O'Haro what tests she should order for such a patient. (*See id.* at 57:4-13).

144.    O'Haro responded, "Blood work." (*See id.*)

145.    Because O'Haro was in the final semester of HACC's Nursing Program, Professor Lindstrom expected O'Haro—at the very least—to request a complete blood cell count and glucose levels for such a patient. (*See id.* at 58:2 to 59:12).

146.    At some point that same evening, Professor Lindstrom instructed O'Haro to administer 5 milligrams of Valium to a patient and asked O'Haro how fast the medication should be pushed through the IV. (*See id.* at 51:11-23).

147.    Without consulting any pharmaceutical resources—or even requesting to do so—O'Haro said, "Three to five minutes." (*See id.* at 51:11-23; 98:1-20).

148.   A Valium push must be administered at a rate of 5 milligrams per minute. So a 5 milligram dose should be administered in one minute. (*See id.* at 51:22-23).

149.   When Professor Lindstrom asked if she was sure about the timing, O'Haro blurted out, "Yes"—again without consulting any pharmaceutical resources. (*See id.* at 98:1-17).

150.   Professor Lindstrom informed students at the shift's start that she would help them access a computer if they needed to look up any medications online. (*See id.* at 54:14 to 56:4).

151.   O'Haro, though, did not ask for such assistance. (*See id.* at 51:11-23; 98:1-17).

152.   The treating physician, however, canceled the medication order before the Valium could be administered. (*See id.* at 50:18-23).

153.   As a result, Professor Lindstrom did not issue O'Haro a "not met" evaluation related to the Valium issue. (*See id.* at 50:18-23; 98:21 to 99:22).

154.   That same evening, Professor Lindstrom assigned O'Haro to administer a "bolus dose" of a medication called Heparin to a patient through the patient's IV. (*See id.* at 62:18 to 68:8; *see also* O'Haro Depo., Ex. 9, at 222:5-8; Lindstrom Aff., Ex. 22, at ¶ 11).

155.   A bolus dose is simply a quantity of fluid or medication administered through a syringe at a controlled, rapid rate. (*See* Lindstrom Aff., Ex. 22, at ¶ 12).

156.   Nurses use a bolus dose to increase a medication's effects or therapeutic levels. (*See id.* at ¶ 13).

157.   When calculating the Heparin bolus does for Professor Lindstrom on February 19, O'Haro calculated the dosage three times and came up with three different answers. (*See id.* at ¶15; *see also* Lindstrom Depo., Ex. 21, at 62:18 to 64:13).

158.   She appeared confused and didn't know which of her three calculations was correct. (*See id.*).

159.   Eventually, a nurse on duty intervened to provide O'Haro with the correct dosage. (*See* Lindstrom Aff., Ex. 22, at ¶ 16).

160.   Dosage calculation is a task students learn during the Nursing program's first semester. (*See id.* at ¶¶ 16-17; *see also* Lindstrom Depo., Ex. 21, at 39:5-9; *see also* LaRue Depo., Ex. 3, at 37-22-38:19; 40:19-25).

161.   Students in their final semester are expected to calculate a bolus dose and its infusion rate. (*See* Lindstrom Aff., Ex. 22, at ¶ 14).

162.   O'Haro also struggled to pull the correct amount of medication into the syringe. (*See* Lindstrom Depo., Ex. 21, at 64:7 to 65:11).

163.    To Professor Lindstrom, it appeared that O'Haro didn't understand what the measurement marks on syringe represented. (*See id.* at 64:15-65:2).

164.    Then, once Professor Lindstrom had approved O'Haro to administer the medication, O'Haro told the patient that she was going to administer the medication in his abdomen. (*See id.* at 65:13-24; *see also* O'Haro Depo., Ex. 9, at 228:3-24).

165.    That would have been the incorrect route. (*See* Lindstrom Depo., Ex. 21, at 65:13-66:15).

166.    The medication order stated that the bolus dose had to be administered through the patient's IV device in his arm. (*See* Lindstrom Aff., Ex. 22, at ¶ 19).

167.    Professor Lindstrom stopped O'Haro before she administered the medication. (*See* Lindstrom Depo., Ex. 21, at 65:13 to 66:15).

168.    Lindstrom instructed O'Haro to come back over to the computer—where Lindstrom was standing—to verify the medication order. (*See id.*).

169.    O'Haro told Lindstrom that she knew what the correct route was. (*See id.*)

170.    But O'Haro went back over toward the patient as the patient lifted her gown to expose her abdomen. (*See id.*)

171.    O'Haro did not correct the patient by indicating that the medication would actually be administered through the IV. (*See id.*)

172.    Instead, O'Haro advanced toward the patient with the syringe in her hand. (*See id.*)

173.    At that point, Professor Lindstrom feared that O'Haro was about to insert the syringe into the patient's abdomen. (*See id.* at 68:10-15)

174.    Professor Lindstrom called to O'Haro again and made her approach the computer a second time. Using the computer's cursor, Lindstrom circled the route on the medication order, which indicated that the medication had to be administered through the patient's IV. (*See id.* at 65:13 to 66:15).

175.    O'Haro said, "I know" and then told the patient that the medication would be administered through the IV. (*See id.*)

176.    O'Haro then administered the medication through the patient's IV. (*See id.*)

177.    Lindstrom feared that, had she not intervened, O'Haro would have inserted the syringe in the patient's abdomen without consulting the medication order on the computer. (*See id.* at 100:15-20).

178.    Because of these errors, Professor Lindstrom informed Lott and LaRue that O'Haro had not satisfied the conditions required to remediate the "not met" evaluations she had received previously. (*See id.* at 76:14-18; *see also* N250 Clinical Evaluation Tool, Ex. 19, at Bates No. D000810-D000811; Updated Action Plan, attached as Exhibit 23).

26

179.   Additionally, Lindstrom rated O'Haro as "not met" in the categories of "professionalism" and "clinical problem solving" for the clinical shift on February 19, 2015. (*See* Clinical Evaluation Tool, Ex. 19, at Bates No. D000810-D000811).

180.   The clinical shift on February 19, 2015, was the final clinical shift for Nursing 250 during the Spring 2015 semester. (*See* Clinical Evaluation Tool, Ex. 19 (noting no other clinical shift evaluations after 2/19/15)).

181.   O'Haro had failed to remediate the concerns noted in her action plan. (*See* Feb. 24, 2015 Results of Action Plan, attached as Exhibit 23; *see also* Jill Lott's 02/26/15 Notes, attached as Exhibit 25).

182.   Accordingly, the Nursing faculty assigned O'Haro a failing grade in Nursing 250. (*See id*.).

183.   That automatically resulted in O'Haro failing Nursing 250, regardless of the outcome of the course's theory component. (*See id*.).

184.   The failing grade for Nursing 250 marked the second failing grade O'Haro had received in the program. Accordingly, the Nursing faculty removed her from the program. (*See id.*; *see also* LaRue Depo., Ex. 3, at 202:10-13; HACC's Readmission Procedure, attached as Exhibit 5, at Bates No. D46 ("A student with **two failures . . . from the same nursing program will not be eligible for readmission to that program.**" (emphasis in original)).

27

185.   O'Haro filed an appeal challenging the grade. (*See* Student Appeal of Academic Decision Form, attached as Exhibit 26).

186.   HACC's Appeals of Academic Decisions Committee unanimously upheld the failing grade. (*See* April 29, 2015, Letter from Kathleen Doherty, attached as Exhibit 27).

187.   During the grade appeal process, the Appeals of Academic Decisions Committee reviewed materials submitted by O'Haro and the Nursing faculty regarding the grades that O'Haro had challenged. (*See* Affidavit of Dory Uhlman, attached as Exhibit 28, at ¶ 9).

188.   Those materials included O'Haro's denials regarding what the Nursing faculty indicated that they had observed. (*See* Uhlman Aff., Ex. 28, at ¶ 10; *see also* O'Haro's Appeal Letter, attached as Exhibit 29).

189.   Additionally, the materials submitted to Appeals of Academic Decisions Committee included explanations regarding why the faculty graded O'Haro the way that they did and responses to O'Haro's allegations about unfair grading. (*See* Deposition of Dory Uhlman, attached as Exhibit 30, at 23:13-25; *see also* Grade Appeal Response from Caren LaRue, attached as Exhibit 31; Grade Appeal Response from Kara Lindstrom, attached as Exhibit 32).

**O'Haro has not become a registered nurse since her removal from HACC's program.**

190.   O'Haro hasn't gone on to become a registered nurse since HACC removed her from its program. (*See* O'Haro Depo., Ex. 9, at 46:24 to 47:3).

191.   O'Haro has not attempted to enroll in HACC's Practical Nursing program since she was removed from the Registered Nursing Program. (*See id.* at 48:23 to 49:13).

192.   O'Haro, however, has applied for admission to the Nursing program at Hagerstown Community College since her removal from HACC's Registered Nursing Program. (*See id.* at 40:23 to 41:4).

193.   Hagerstown Community College required that O'Haro take an entrance exam—called the Test of Essential Academic Skills, or "TEAS Exam"—as a condition of her admission into that college's Registered Nursing Program. (*See id.* at 53:15 to 54:19).

194.   Nursing programs around the country use the TEAS Exam to measure whether applying students have the necessary core academic skills to complete demanding Nursing programs. (Lott Aff., Ex. 16, at ¶ 18).

195.   In June of 2015, O'Haro scored a 47.3% of the TEAS exam. (*See* O'Haro's ATI TEAS Exam Scores, collectively attached as Exhibit 33).

196.   In July of 2015, O'Haro scored a 46.0% on the TEAS exam. (*See id.*)

197.   In June of 2016, O'Haro scored a 50.7% on the TEAS exam. (*See id.*)

29

198.   In May of 2017, O'Haro scored a 53.3% on the TEAS exam. (*See id.*)

199.   In July of 2017, O'Haro scored a 60.7% on the TEAS exam. (*See id.*)

200.   On September 27, 2017, Hagerstown Community College rejected O'Haro's application for admission to its Nursing Program because her TEAS "score did not meet the minimum required score for [her] file to be reviewed for acceptance into the nursing program." (*See* September 27, 2017, Letter to Silvia O'Haro, attached as Exhibit 34).

201.   Currently, HACC requires students to obtain a 70% on the TEAS exam for admission to HACC's Registered Nursing associate degree program. (*See* Lott Aff., Ex. 16, at ¶ 20).

202.   O'Haro has never scored a 70% on the TEAS exam. (*See* Ex. 33).

**O'Haro cannot establish pretext.**

203.   HACC's Program Handbook requires that all students must remedy any noted clinical deficiency in the clinical setting. (*See* Remediating an Unsafe Practice Incident, attached as Exhibit 35 ("The student must satisfactorily re-perform this behavior in the clinical setting to amend the clinical objective to a 'met' objective in the Clinical Performance Evaluation Tool."); *see also* Lindstrom Depo., Ex. 21, at 101:7-20).

204.   Student "K.E." was enrolled in Nursing 240 during the Fall 2014 semester. (*See* K.E.'s September, 25, 2014, Nursing 240 Clinical Evaluation, attached as Exhibit 36).

205.   On September 25, 2014, Professor Ronda Morrison issued K.E. a "Nursing Learning Laboratory Educational Prescription." (*See* K.E.'s Prescription, attached as Exhibit 37).

206.   K.E. received that prescription to practice safely administering medication to two patients at the same time. (*See id*.; *see also* Deposition of "K.E.," attached as Exhibit 38, at 15:22 to 19:3).

207.   On October 1, 2014, Professor Sharon Roberts indicated that K.E. had satisfactorily demonstrated her competency on that skill. (*See* Lab Prescription, Ex. 37).

208.   K.E. completed two-patient medication passes during her clinical placements in Nursing 240 after October 1, 2014. (*See* K.E. Depo., Ex. 38, at 20:2-5).

209.   Professor LaRue was not an instructor of K.E. in Nursing 240 during the Fall 2014 semester. (*See id.* at 19:10-14; *see also* LaRue Depo., Ex. 3, at 148:10-21).

210.   During Nursing 250, O'Haro did not receive any "not met"

evaluations for drawing up a medication outside Professor LaRue's presence. (*See*

LaRue Aff., Ex. 1, ¶ 93).

Respectfully submitted,

BARLEY SNYDER LLP

*/s/ David J. Freedman*
David J. Freedman, Esq. (Pa. Bar No. 207257)
dfreedman@barley.com
Kareemah Mayer, Esq. (Pa. Bar No. 326031)
kmayer@barley.com
126 East King Street
Lancaster, PA 17602-2893
Tel:  (717) 299-5201
Fax: (717) 291-4660
*Attorneys for Defendant Harrisburg Area*
*Community College*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that this 1st day of November, 2019, a true and

correct copy of the foregoing, Defendant Harrisburg Area Community College's

Brief in Support of Its Motion for Summary Judgment, has been filed with the

Court's CM/ECF system and is available for downloading:

Sara A. Austin, Esq.
Austin Law Firm LLC
226 E. Market St.
York, Pa 17403
(717) 846-2246
saustin@austinlawllc.com

BARLEY SNYDER, LLP

*/s/ David J. Freedman*
David J. Freedman, Esq. (Pa. Bar No. 207257)
dfreedman@barley.com
Kareemah Mayer, Esq. (Pa. Bar No. 326031)
kmayer@barley.com
126 East King Street
Lancaster, PA 17602-2893
Tel:  (717) 299-5201
Fax: (717) 291-4660
*Attorneys for Defendant Harrisburg Area*
*Community College*