## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SILVIA M. O'HARO,                      :       Civil No. 1:18-cv-02073
                                       :
          Plaintiff,                   :
                                       :
          v.                           :
                                       :
HARRISBURG AREA COMMUNITY              :
COLLEGE,                               :
                                       :
          Defendant.                   :       Judge Jennifer P. Wilson

## **<u>MEMORANDUM</u>**

This case proceeds via the second-amended complaint filed by Plaintiff,

Silvia M. O'Haro ("O'Haro"), an African-American person of Jamaican national

origin.  O'Haro sues Defendant, Harrisburg Area Community College ("HACC"),

for discrimination and retaliation under 42 U.S.C. § 1981, stemming from her

dismissal as a student in HACC's Registered Nursing program.  Pending before the

court is HACC's motion for summary judgment.  Because O'Haro (1) has failed to

establish a prima facie case for discrimination, and (2) abandoned her retaliation

claim by failing to respond to HACC's arguments regarding the same, the court

will grant the motion.

## PROCEDURAL HISTORY

On October 25, 2018, O'Haro initiated this federal action by filing a complaint.  (Doc. 1.)[1]  At present, the action proceeds on O'Haro's second-amended complaint.  (Doc. 17.)  O'Haro claims that HACC discriminated against her on account of her race and national origin, in violation of 42 U.S.C. § 1981.  (*Id.* ¶¶ 7, 9, 14–43, 52.)  O'Haro also claims that HACC dismissed her from the program in retaliation for complaining about discrimination, in further violation of § 1981.  (*Id.* ¶¶ 11–12, 53.)  Both claims are raised in a single count that O'Haro lists as Count II.[2]  (*Id.* ¶¶ 51–54.)  For remedies, O'Haro requests back pay (i.e., "the difference between what she has earned since the date of dismissal from the nursing program through the date of the judgment and what she could have earned during that period as an RN nurse . . . ."), compensatory damages, attorneys' fees and costs, and an injunction that precludes HACC from disparaging her or retaliating against her or her family.  (*Id.* at p. 11.)

---

[1] Where appropriate, for ease of reference, the court utilizes page numbers from the CM/ECF header.

[2] In her first-amended complaint, at Count I, O'Haro purported to assert a discrimination claim under Title VI.  (Doc. 6, p. 10.)  In the second-amended complaint, O'Haro continues to identify a "Count I," but states that the purported claim and associated paragraphs have been "DELETED."  (Doc. 17, p. 10.)

On September 30, 2019, discovery closed.  (*See* Doc. 26.)  Thereafter, on November 1, 2019, HACC filed the pending motion for summary judgment along with a brief in support, a statement of facts, and exhibits.  (Docs. 29–31.)  In response, O'Haro filed a timely brief in opposition with exhibits, an answer to HACC's statement of facts, and her own statement of facts.  (Docs. 37–38.)  On December 20, 2019, HACC filed its reply brief.  (Doc. 39.)

Since then, the court permitted HACC to re-file its exhibits due to an apparent ECF docketing error.  On September 3, 2020, HACC complied.  (*See* Doc. 42; Doc. 43.)  In addition, the court has since struck two of Plaintiff's exhibits, Doc. 37-1 and Doc. 37-7, after the court discovered they were defective and O'Haro's counsel failed to appear for a scheduled conference call to discuss remediation of the same.  (Doc. 46; *see also* Doc. 50 (denying O'Haro's motion for reconsideration).).  HACC's motion for summary judgment is now ripe for review.

## FACTUAL BACKGROUND[3]

### A. HACC's Registered Nursing Program And O'Haro's Enrollment In The Spring Of 2013

HACC is a community college with more than 50,000 students enrolled across five campuses and through its online component.  (Doc. 31, ¶ 1.)  HACC offers a Registered Nursing program, allowing qualified students to earn an associate degree.  (*Id.* ¶ 2.)  After earning a degree in the program, graduates are expected to be able to function in a clinical environment with entry-level competency and safety.  (Doc. 43-5, p. 6.)  Earning a degree is an important step in the pursuit of a career in nursing.  But, to ultimately become a licensed Registered Nurse, graduates must also sit for and pass the National Council Licensure Examination ("NCLEX").  (Doc. 31, ¶¶ 3–4.)

---

[3] In this section, the court relates disputed and undisputed facts.  When the court relates disputed facts, it does so consistent with the standard of review, *infra*.  Furthermore, the court notes that, in her responsive statement of facts, O'Haro does not address every paragraph or assertion made by HACC.  In accordance with Federal Rule of Civil Procedure 56 and Local Rule 56.1, the court will treat any unaddressed paragraphs and / or assertions as undisputed and admitted.  *See* Fed. R. Civ. P. 56 (e)(2) (providing that the court can consider a fact undisputed if a party fails to address another party's assertion); M.D. Pa. L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party").  Likewise, the court will not (1) treat as disputed any assertion of fact made by HACC that O'Haro intends to dispute but fails to properly support with record evidence, or (2) treat as a fact for purposes of resolving the pending motion any improperly-supported assertions that O'Haro affirmatively makes in her relevant filings.  *See* Fed. R. Civ. P. 56(c)(1), (e); *see also* M.D. Pa. L.R. 56.1 ("Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.").

Each nursing course in HACC's program featured a combination of classwork learning (the "theory component") and real-life clinical experiences (the "clinical component"). (*Id.* ¶ 5.) To pass, students were required to satisfactorily complete both components in the same semester. (*Id.* ¶ 6.)

The theory component provided students with classroom-based academic training. (*Id.* ¶ 7.) Students in that component were tested through written examinations, quizzes, and assignments. (*Id.*) A passing grade in the theory component consisted of a "C" (75%) or above. (*Id.* ¶ 8.)

During the clinical component, students were tasked with treating patients at health-care facilities under the direction and supervision of licensed practitioners. (*Id.* ¶ 9.) Students also learned and practiced required skills in the program's nursing laboratory. (*Id.* ¶ 11.) As a student progressed in the program, skills were to increase in complexity until the student demonstrated sufficient proficiency to transition safely into professional practice. (*Id.* ¶ 10.) During their enrollment, however, the students were "not permitted to perform every task that a licensed Registered Nurse is permitted to perform." (Doc. 43-5, p. 6.) But again, upon graduating, the students were expected to be able to function in a clinical environment. (*Id.*)

In terms of grading the clinical component, the faculty was responsible for validating students' clinical performance. (Doc. 31, ¶ 12.) Students were required to must meet all clinical-evaluation criteria to pass each course's clinical component. (*Id.* ¶ 13.) In addition to these component requirements, students must have maintained no less than a 2.0 grade point average ("GPA") to continue in the program from semester to semester. (*Id.* ¶ 14.)

Furthermore, at the time relevant to this action, if a student failed Nursing 206 or a select number of other courses, and the student desired to continue in the program, the student was required to "personally submit a completed Request for Readmission Form." (*See* Doc. 42-5, p. 2.) A student who failed two independent courses while in the Registered Nursing program would be dismissed from the program and would not automatically be eligible for readmission. (Doc. 42-3, p. 202; *see* Doc. 42-5, p. 2.) Rather, the same student could be readmitted upon earning a certificate in HACC's Practical Nursing certificate program and passing the Practical Nursing licensing exam. (Doc. 31, ¶¶ 16–17.) Upon readmission to the Registered Nursing program, credit would be given to the student for courses previously passed. (*Id.* ¶ 17.)

In the spring of 2013, O'Haro enrolled in HACC's Registered Nursing program at the Gettysburg, Pennsylvania Campus. (Doc. 31, ¶¶ 18–20.) During the first three semesters, O'Haro earned passing grades. (*Id.* ¶ 22.) But things changed in the Fall 2014 semester.

## B. In The Fall 2014 Semester, O'Haro Failed Nursing 206

For the Fall 2014 semester, O'Haro enrolled in the nine-credit Nursing 206 course. (Doc. 31, ¶¶ 23, 25.) At the time, Nursing 206 was the final course in the Registered Nursing program. (*Id.* ¶ 24.)

To pass the course, students had to successfully complete clinical rotations relating to acute care, medical and surgical care, pediatric medicine, and critical care. (*Id.* ¶ 26.) During the clinical rotations, faculty tasked students with administering care and completing related documentation, akin to what professional nurses would be required to do. (*Id.* ¶ 27.) One of the most important requirements of the course's clinical component involved evaluating students' application of critical thinking. (*Id.* ¶ 28.) In that vein, nurses do not simply take orders and administer medications. (*Id.* ¶ 29.) Nurses, instead, are responsible for ensuring patients' safety and facilitating treatment outcomes. (*Id.* ¶ 30.) Thus, nurses must understand and be able to articulate treatment methods and the reasons medications are prescribed. (*Id.* ¶ 31.)

While O'Haro was enrolled in Nursing 206: (1) Professor Arletta Molnar (a clinical instructor, *see* Doc. 42-9, pp. 21–22) commented that she had "very strong concerns about [O'Haro's] grasp of the care of the patient from a critical thinking perspective;" (2) Professor Caren LaRue (the classroom instructor for the Nursing 206 course), noted that O'Haro "did not demonstrate . . . that she knew purpose of medication" and that she "need[ed] to be able to articulate and understand medication;" (3) Professor LaRue also indicated that O'Haro's "problem identification . . . [wa]s too basic for . . . N206 critical thinking;" and (4) in a "Guide to Client Centered Care Worksheet" that O'Haro drafted, Professor Connie Miller provided O'Haro with detailed explanations regarding "serious issues." (Doc. 42-11, pp. 5, 11, 18; *see* Doc. 31, ¶¶ 35, 37; Doc. 42-12, p. 2.)  In addition, on October 9, 2014, the Registered Nursing program's faculty leadership sent O'Haro a letter notifying her that she was in danger of failing the course's theory component.  (Doc. 31, ¶ 36.)

As a follow up to the faculty-leadership letter, Professor LaRue met with O'Haro.  (*Id.* ¶ 37.)  During the meeting, Professor LaRue explained to O'Haro that she needed to score an 81.5% (75 points out of 92) on the final exam to pass Nursing 206.  (*Id.*)  O'Haro had only averaged 72% on the first five exams.  (*Id.* ¶ 38.)

Professor Jill Lott, the Director for the program at the Gettysburg Campus, also met with O'Haro to discuss options before the final exam.  (*See* Doc. 43-2, p. 26; Doc. 43-3, ¶¶ 6–11.)  Professor Lott informed O'Haro that she could withdraw from the course before taking the final exam without impacting her GPA.  (*Id.*)

During the same meeting, O'Haro claimed that she felt the faculty was discriminating against her based on her race.  (Doc. 31, ¶¶ 45–46.)  Professor Lott informed O'Haro that such accusations were to be directed to Leslie Boon, the Interim Campus Dean of Academic Affairs for the Gettysburg Campus.  (*Id.* ¶ 46.) O'Haro never reported her concerns to Dean Boon.  (*Id.* ¶ 47.)  But, at some point, O'Haro indicated to a friend and fellow Nursing student, T.L.,[4] that she was suffering from discrimination.  (*See* Doc. 43-28, pp. 5–6, 19.)

According to T.L., "professors" would "get frustrated with [O'Haro] because there was such a language barrier."  (*See id.* at 19–20.)  Furthermore, according to T.L., Professor Molnar, who taught the clinical portion, would "disregard" or "not pay mind" to O'Haro whenever she would have questions or concerns.  (*Id.*)  T.L. presumed that occurred because of O'Haro's race.  (*Id.*)  On the other hand, T.L. observed that O'Haro "did not understand things as easily as others," "[s]truggle[d] through clinical" and "struggle[d] through theory," and "just

---

[4] When referring to nursing students other than O'Haro, the court follows the lead of counsel and simply identifies them by initials.

was not somebody that could take tests." (*Id.* at 7, 19-20.)  While T.L. observed that HACC seemed to "pick and choose" which students would stay or be removed from the Registered Nursing program, she noted that it had nothing to do with race and more to do with whether the student was "weak" (i.e., had poor grades or was not progressing) and would likely fail the NCLEX.  (*See id.* at 19-20.)

Toward the end of the same semester, O'Haro also told an individual who worked in HACC's administration, Marilyn Teeter ("Teeter"), about "[h]ow [she] was being treated at the clinical site by [Professor] Molnar."  (*See* Doc. 42-9, pp. 17–18.)  O'Haro explained that she believed the "treatment" was based on her race and national origin.  (*See id.* at 17.)  In response, Teeter advised O'Haro "to focus on the finals," after which she wished to meet with O'Haro and Professor Molnar. (*See id.* at 18.)  A meeting, however, was never scheduled.  (*See id.*)

O'Haro elected to take the final exam for Nursing 206.  (*See* Doc. 31, ¶ 48.) O'Haro scored 64.5 out of 92 points, leaving her 8.5 points short of passing.  (*Id.* ¶¶ 48–49.)  O'Haro did not appeal the failing grade she received in the course.  (*Id.* ¶ 51.)  According to O'Haro, she thought that verbatim exam questions were necessary.  But Professors Lott and LaRue did not permit O'Haro to copy verbatim questions to the exams.  (*See* Doc. 42-9, pp. 30, 35–36.)  The Professors only permitted O'Haro to review questions to the final exam.  (*Id.*)  By comparison,

B.M., an Italian / Argentinian student, was permitted to write down exam questions verbatim.  (*See id.* at 35–36.)

But even if O'Haro had appealed her grade, during Professor LaRue's tenure at HACC, the maximum number of points ever received through a grade appeal was 5.5 points.  (*See* Doc. 39-1, p. 12.)  O'Haro's passing score fell 3 points shy of that maximum potential appeal adjustment.  (Doc. 31, ¶¶ 48–49.)  Notably, two Caucasian students, L.F. and E.P., also failed the theory component of the same course and did not file grade appeals.  (Doc. 39-1, p. 11–12; *see also* Doc. 31, ¶ 50.)  L.F. failed by six points; E.P. failed by 12 points.  (Doc. 39-1, pp. 11–12.)  Furthermore, M.B.M, a Latina student, failed by 5.5 points, and R.W., a Caucasian student, failed by just three points.  (*Id.*) By contrast to O'Haro, L.F. and E.P., the students whose failing grades were within range of the maximum points received on any prior appeal (M.B.M. and R.W.) filed and succeeded on their appeals.  (*Id.*)

### C. Professors Lott And LaRue Again Met With O'Haro After She Failed The Theory Component Of Nursing 206

On December 18, 2014, Professors Lott and LaRue met with O'Haro again to explain her options after failing the theory component of Nursing 206.  (Doc. 31, ¶ 52.)  During that meeting, the professors did not explain to O'Haro that HACC had already decided to change the Registered Nursing program's curriculum at the Gettysburg Campus.  (*See id.* ¶ 42; Doc. 42-9, p. 38.)  Nor did they explain that, under the new curriculum beginning in the Spring 2015 semester, Nursing 206

would be split into three separate "mini-mester" courses – Nursing 250, Nursing 251, and Nursing 243 – or that Nursing 206 would be offered at the Harrisburg, Pennsylvania Campus.  (*See* Doc. 31, ¶ 43; Doc. 42-9, p. 38.)  If O'Haro was made aware of that information, even though the Harrisburg Campus was more than 45 minutes away from where she resided, she would have elected to re-take Nursing 206 rather than continue in the Registered Nursing program at the Gettysburg Campus.  (*See* Doc. 42-9, pp. 37–38.)  Because O'Haro felt as though she had no other choice and had failed Nursing 206 during the Fall 2014 semester, she chose to seek readmission to the program at the Gettysburg Campus.  (*See id.*)  Accordingly, to graduate, O'Haro would be required to pass the clinical and theory potions of each of the three mini-mester courses in the Spring 2015 semester.  (*See* Doc. 31, ¶ 44.)

### D. HACC Readmitted O'Haro To The Registered Nursing Program, But She Failed Nursing 250

Having failed Nursing 206 and believing that she had no other option, O'Haro submitted a request for readmission to the Registered Nursing program at the Gettysburg Campus.  (Doc. 43-4; *see* Doc. 42-9, p. 38.)  Specifically, she requested readmission to the program so that she could take Nursing 250, 251, and 243 for the Spring 2015 semester.  (Doc. 43-4.)

On her readmission form, O'Haro wrote that, to improve her performance in the Registered Nursing program, she would "study harder," "seek help on problem[s] that [are] difficult," and "try to prioritize school and work." (*Id.*) While the form did not expressly compel such a disclosure, nowhere on the readmission form did O'Haro note, indicate, or complain about discrimination. (*Id.*)  Rather, when prompted to state the "[r]eason(s) for withdrawal . . . or failure," O'Haro wrote: "Failed N206." (*Id.*)  In the end, O'Haro's request was approved, and HACC readmitted her to the program.

O'Haro began the Spring 2015 semester with Nursing 250. (Doc. 31, ¶ 56.) Going into the final exam, O'Haro had a passing grade in the theory component of the course. (*Id.* ¶ 57.)  Also, Professors LaRue and Connie Miller had both reported that O'Haro "met" evaluations during her first six clinical days, meaning O'Haro had satisfied the clinical criteria during those rotations. (*Id.* ¶ 58.) Moreover, on February 6, 2015, Professor LaRue praised O'Haro's work, exclaiming "Good Job!" (*Id.* ¶ 59.)  Then came O'Haro's February 12, 2015 clinical rotation.

### 1.  O'Haro's February 12, 2015 Clinical Rotation

On February 12, 2015, O'Haro was scheduled to complete a clinical rotation at Carlisle Hospital under the direction of Professor LaRue. (*Id.* ¶ 60.)  During this clinical rotation, Professor LaRue gave O'Haro various tasks.

### a.  O'Haro Was Tasked With Administering Medication To A Patient

Professor LaRue tasked O'Haro with administering an oral high-blood pressure medication, Cozaar PO, to a patient.  (*Id.* ¶¶ 61, 66, 67.)  Afterward, Professor LaRue concluded that O'Haro made a major mistake.  (*See id.* ¶ 71.)  In her view, O'Haro almost improperly administered the medication to the patient and failed to know the medication's correct purpose.  (*See id.* ¶¶ 62-73.)  O'Haro, however, has a different take on what happened.

O'Haro admits that, at first, she did not know about the medication, and that Professor LaRue instructed her to look up information on it.  (*See* Doc. 42-9, p. 41; Doc. 31, ¶ 74; Doc. 38, p. 3.)  O'Haro further admits that, at some point, she told the patient: "I have your PO med."  (Doc. 31, ¶ 62; *see* Doc. 42-9, pp. 41–42.)  And, in response, the patient questioned her, causing O'Haro to clarify she meant oral medication.  (*See* Doc. 31, ¶ 63; *see also* Doc. 42-9, p. 42)[5]  But even so,

---

[5]  During O'Haro's deposition, the following exchange occurred:

Q.   Okay.  Did you ever say to the patient, I have your PO med?

A.   PO mean (sic) by mouth.  So maybe I said PO, meaning mouth.

Q.   Yeah.

A.   Oral.

Q.   And did the patient respond, PO?

A.   Probably that's when I said oral.  Oral medication.

Professor LaRue never instructed O'Haro to otherwise explain the medication to the patient.  O'Haro also did not attempt to improperly administer the medication; nor did she incorrectly tell the patient that the medication was for the patient's "potassium" and "belly."  (*See* Doc. 42-9, pp. 41–42.)

### b.  O'Haro Was Tasked With Reconstituting Medication

During the same rotation, Professor LaRue tasked O'Haro with reconstituting a medication, which is something HACC's Nursing faculty addresses in the first course of the Registered Nursing program.  (Doc. 31, ¶¶ 75, 84.)  The process required O'Haro to mix a prescribed ratio of powdered medication with saline.  (*Id.* ¶ 76.)  Once mixed, the reconstituted medication would be administered to the patient through an intravenous ("IV") device.  (*Id.* ¶ 77.)

O'Haro needed 2 ml of reconstituted medication.  (*Id.* ¶ 78.)  When O'Haro presented the syringe to Professor LaRue for inspection, however, it only had 1.5 ml of reconstituted medication.  (*Id.* ¶ 79.)  Professor LaRue also noticed a wet spot on the counter where O'Haro had drawn the reconstituted medication into the syringe.  (*Id.* ¶ 80.)  That suggested to Professor LaRue the missing .5 ml had spilled out at some point.  (*Id.* ¶ 81.)

---

(Doc. 42-9, pp. 41–42.)

According to Professor LaRue, when she pointed that out, O'Haro asked if she could simply add another .5 ml of saline, which would have ruined the medication's concentration.  (*Id.* ¶¶ 82–83.)  O'Haro, though, denies ever asking that question to Professor LaRue.  (*See* Doc. 42-9, p. 40.)  O'Haro further denies that Professor LaRue confronted her about any spills at the clinical site.  (*See id.*)

Regardless, it is undisputed that the medication was improperly constituted and, as a result, had to be wasted.  (*See id.*)  O'Haro places the blame for the improper reconstitution with Professor LaRue, whom O'Haro relied on when mixing the powdered medication with the saline.  (*See* Doc. 42-9, pp. 39–40.)

### c.  O'Haro Was Tasked With Administering A Medication Injection To A Patient

Nurses must instill confidence in the patients receiving medication to allow the entire process to run smoother.  (Doc. 31, ¶ 91.)  In the early semesters of the Registered Nursing program, students prepare medications outside of a patient's room and under the supervision of the clinical instructor.  (*Id.* ¶ 92.)  By the final semester of the program, which O'Haro was in at this time, students should be able to demonstrate professional nursing behavior by preparing medications in the patient's room.  (*Id.*)  Furthermore, as the nurse is preparing and checking the medications in the patient's room, a final-semester student must be able to explain the medication's purpose to the patient, answer any questions from the patient, and quickly administer the medication.  (*Id.* ¶ 93.)

On February 12, 2015, when Professor LaRue also had O'Haro administer a medication injection to a patient, O'Haro failed those tasks. (*Id.* ¶¶ 87, 93.) O'Haro failed to explain the medication to the patient – even though that is a requirement for professional administration of medication. (*Id.* ¶ 88.) Thus, when O'Haro attempted to administer the medication, the patient hesitated and refused to let her proceed. (*Id.* ¶ 89.) The patient then asked for a more experienced nurse. (*Id.*) O'Haro responded "ok." (*Id.* ¶ 90.)

When the patient refused and asked for a more experienced nurse, Professor LaRue took O'Haro into the hallway and explained that O'Haro's failure to organize the medication before entering the room and explain the medication's purpose likely triggered a lack of confidence in O'Haro's abilities. (*Id.* ¶ 94.) Professor LaRue also asked O'Haro how she would have handled that situation if she had been a professional nurse. (*Id.* ¶ 95.) O'Haro responded that she would have asked a co-worker to administer the medication for her. (*Id.*) Professor LaRue felt that was not acceptable since it could upset the allocation of duties among nursing staff. (*Id.* ¶ 96.) After all of this, when Professor LaRue returned to the patient's room and explained that the medication was not needed to treat the patient's condition, the patient, who was being discharged, ultimately refused the medication altogether. (*See* Doc. 42-2, pp. 157–58.)

### d. Professor LaRue Graded O'Haro As "Not Met" In Certain Categories

Professor LaRue graded O'Haro for her February 12, 2015 clinical rotation. In the categories of "professionalism," "critical thinking," and "caring," O'Haro received the grade of "not met."  (Doc. 31, ¶ 97; *see also* Doc. 43-6, pp. 15–16.) With respect to the "professionalism" "not met," it partially related to the incident involving the reconstitution and waste of medication.  (*See* 43-6, p. 15.)  Indeed, in the "professionalism" category, Professor LaRue faulted O'Haro for "not accura (sic) reconstitute / med wasted / care delayed pending pharm (sic) delivery."  (*Id.* at 15.)

O'Haro contrasts her "not met" review with another student.  O'Haro observes that during the previous semester, a Caucasian student, K.M., was tasked with administering medication to a patient.  (*See* Doc. 43-2, pp. 21–22.)  Because K.M. failed to check the Medication Administration Record to confirm whether the physician or other healthcare provider made any changes to the medication order, the student drew more medication than what had been ordered in an amended order.  Because of that error, which likely would not have occurred if K.M. adhered to the "7 rights of administration"[6], the medication had to be wasted.  (*See*

---

[6] This is a reference to the "3 checks and 7 rights of administration," a tool used by nurses to ensure safe medication administration.  (Doc. 31, ¶ 131.)  The "7 rights" relate to the following topics that a nurse must confirm: right medication, right patient, right dosage, right route, right time, right reason, and right documentation.  (*Id.* ¶ 132.)  The "3 checks" concern the nurse's

*id.*)  K.M., who was not tasked with reconstituting a medication, nevertheless did not receive a "not met" evaluation in that situation.  (*Id.*)[7]

At the end of the next clinical rotation on the following day, O'Haro received additional "not met" evaluations.

### 2.  O'Haro's February 13, 2015 Clinical Rotation

The last day of O'Haro's medical / surgical clinical was February 13, 2015. (Doc. 31, ¶ 98.)  During the rotation on that day, O'Haro approached Professor LaRue about concerns with administering a prescribed heart medication to a patient whose blood-pressure readings registered slightly below normal.  (*Id.* ¶ 99.) If the patient had been taking the medication before admission without complications, then the patient's slightly-lower-than-normal blood-pressure reading would not have justified withholding the prescribed heart medication.  (*Id.* ¶ 101.)

---

confirmation of the "7 rights" three separate times: when pulling the medication, when preparing the medication, and at the patient's bedside before administering the medication.  (*Id.* ¶ 133.)

[7] O'Haro also asserts that another Caucasian student did not receive a "not met" evaluation when a patient refused medication "because [the student] was 'a 4th semester student but not a nurse.'" (*See* Doc. 38, p. 7.)  O'Haro, however, takes the quoted testimony out of context.  Professor LaRue gave that answer in response to a question asked by O'Haro's counsel about why the student did not receive a "not met" for <u>wasting medication</u>.  (Doc. 42-2, pp. 165–67.)  What is more, O'Haro was not provided with a "not met" merely because her patient refused medication. The "not mets" related to O'Haro's approach and handling of her own clinical situation, from Professor LaRue's point of view.  (*See* Doc. 43-6, pp. 15–16.)

When Professor LaRue questioned O'Haro about her hesitation, O'Haro did not know whether the readings were normal for the patient or whether the patient had been taking the medication at home before admission to the hospital. (*Id.* ¶ 100.) Professor LaRue and O'Haro thus reviewed the patient's chart together. (*Id.* ¶ 102.) The patient's chart revealed that the patient had been taking the prescribed heart medication for some time before his admission to the hospital. (*Id.* ¶ 103.) Additionally, the patient's historic blood-pressure readings indicated that the slightly-lower-than-normal reading had been steady for some time. (*Id.* ¶ 104.) Also, the heart medication's dosage had been decreased upon the patient's admission to the hospital. (*Id.* ¶ 105.) In all, the patient's chart suggested strongly that administering the heart medication posed little risk that the patient's blood pressure would drop to a dangerous level, especially when that risk was balanced against the heart medication's therapeutic effects. (*Id.* ¶ 106.)

Through questioning, Professor LaRue drew the same information out of O'Haro while they reviewed the chart together. (*Id.* ¶ 107.) Professor LaRue then asked O'Haro if she would still withhold the patient's heart medication. (*Id.* ¶ 108.) O'Haro responded that she would. (*Id.* ¶ 109.)

Professor LaRue then had an in-depth conversation with O'Haro about the prescribed heart medication and its relationship with blood pressure. (*Id.* ¶ 110.) When Professor LaRue asked O'Haro again if she would still withhold the heart

medication given the information available, O'Haro insisted that she would not administer the medication because of the patient's blood-pressure reading. (*Id.* ¶ 112.) Professor LaRue referred O'Haro to the hospital's bedside nurse for a second opinion, who agreed with Professor LaRue and ordered O'Haro to administer the heart medication. (*Id.* ¶¶ 113–14.)

Based on what occurred, Professor LaRue issued O'Haro "not met" evaluations in the categories of "professionalism" and "critical thinking." (*Id.* ¶ 115.) Professor LaRue felt that O'Haro had no clinical justification for refusing to administer the medication. (*Id.* ¶ 116.) Professor LaRue also felt that if O'Haro had been a professional nurse, she would have unilaterally refused administration of a prescribed heart medication without any rational clinical reasoning, which presented a patient safety concern. (*Id.* ¶¶ 119–20.) Furthermore, while it was not error for O'Haro to express concerns about the patient's blood-pressure reading, O'Haro's review of the patient's chart should have dispelled her concerns. (*Id.* ¶¶ 117–18.)

### 3. Professors Lott And LaRue Gave O'Haro A Final Opportunity To Remediate Her "Not Met" Evaluations

On February 18, 2015, Professors Lott and LaRue met with O'Haro to discuss the "not met" evaluations she had received. (Doc. 31, ¶ 121.) By that point, O'Haro's medical / surgical rotation had ended, and she had "not met" evaluations that were not remediated. (*Id.* ¶¶ 122, 124.) Because students were

normally required to remediate "not met" evaluations during the placement in which those evaluations occur, the Nursing faculty could have immediately failed O'Haro.  (*Id.* ¶¶ 123, 125.)

Rather than immediately failing her, however, Professors Lott and LaRue devised a plan to give O'Haro one last opportunity to remediate the "not met" evaluations she received in the medical / surgical rotation.  (*Id.* ¶ 126.) Specifically, O'Haro was required to demonstrate particular skills under the supervision of Professor Kara Lindstrom during O'Haro's regularly scheduled critical-care placement at Hanover Hospital's Emergency Department on February 19, 2015.  (*Id.* ¶ 127.)  The plan also required O'Haro to successfully administer medications utilizing the "3 checks and 7 rights of administration," demonstrate critical thinking and sound reasoning when developing a plan of care for a patient, and organize herself before approaching a patient.  (*Id.* ¶¶ 128, 131–33.)  When Professors Lott and LaRue presented their written plan to O'Haro, she agreed to it by signing her name.  (*Id.* ¶¶ 129–30.)

Nevertheless, according to O'Haro, despite the requirement in HACC's Program Handbook that all Nursing students remediate any noted deficiency in the clinical setting, *see* Doc. 31, ¶ 203, each clinical instructor had the discretion to choose whether the student could alternatively remediate a "not met" in the

laboratory setting.  (Doc. 43-2, p. 87.)  And O'Haro further asserts that the discretion was exercised in a discriminatory manner, to her detriment.

For example, at the end of the Fall 2014 semester, after clinicals had ended, O'Haro saw a Caucasion student, L.F., remediating a skill in the laboratory setting. (*See* Doc. 42-9, p. 68.)  According to O'Haro, the student appeared to be remediating some "significant medication error," in connection with the clinical component of Nursing 206 – the same course for which L.F. ended up failing the theory component.  (*See id.*; Doc. 39-1, p. 12.)

O'Haro further asserts that, in September 2014, H.R., another Caucasian student, was on a clinical rotation with Professor LaRue.  (*See* Doc. 38, pp. 7–8.) During the rotation, "[m]edication was given to a patient who[se] heart rate was below guidelines for safe administration," yet H.R. was permitted to remediate in the laboratory setting.  (*Id.*).  The incident involved the administration of blood-pressure medication.  (Doc. 42-3, pp. 102-03.)  It was eventually determined by Professor LaRue that the administration of the medication did not contribute to the patient's blood pressure dropping, the hospital's bedside nurse ordered H.R. to administer the medication, and the treating cardiologist expressed no concerns about H.R. following the order.  (*Id.* at 104–05, 212–14.)  Thus, because there was no evidence H.R. had done anything wrong, Professor LaRue did not issue a H.R. a "not met."  (*Id.* at 190–92.)

Similarly, O'Haro asserts that during the same clinical rotation, a third Caucasian student, E.G., "who was at the top of the class," engaged in an "unsafe med practice" by drawing up medication "in the med room rather than in the patient's room in front of an instructor." (*See id.* at 8; *see also* Doc. 43-2, p. 21.) And E.G. did not "receive a 'not met'" for doing that. (*See* Doc. 38, pp. 7-8.) But notably, O'Haro never received a "not met" for drawing up medication outside of Professor LaRue's presence. (Doc. 31, ¶ 210.)

O'Haro also complains about K.E., a Caucasian student. K.E. was enrolled in Nursing 240 – not Nursing 250 – during the Fall 2014 semester. (Doc. 31, ¶ 204; *see* Doc. 43-2, pp. 27–28; Doc. 43-25, pp. 4–6.) On September 25, 2014, Professor Ronda Morrison issued K.E. a "Nursing Learning Laboratory Educational Prescription." (Doc. 31, ¶ 205.) K.E. received the Prescription to practice safely administering medication to two patients at the same time. (*Id.* ¶ 206.) About one week later, on October 1, 2014, Professor Sharon Roberts indicated that K.E., who had no pattern of inconsistent progress, satisfactorily demonstrated her competency on that skill in the laboratory setting. (*Id.* ¶ 207; Doc. 43-2, pp. 27–28.) And after October 1, 2014, K.E. completed two-patient medication passes during her clinical placements in Nursing 240. (Doc. 31, ¶ 208.)

In addition, on either February 12 or 13, 2015, K.E. was permitted to remediate a "not met" evaluation in the laboratory setting.  While tending to a 68 year old individual with cellulitis, K.E. received a "not met" from Professor Sharon Roberts that concerned K.E.'s failure to properly hang an IV and the IV piggy back.  (*See* Doc. 37-4, pp. 34–37; *see also* Doc. 42-9, p. 51; Doc. 43-25, p. 9.)  At that point, K.E. was a senior student in the program and in her fourth semester. (*See* Doc. 42-2, p. 163.)  Rather than being required to remediate the "not met" in the clinical setting, K.E. was permitted to remediate the skill – the hanging of an IV – in the laboratory setting on February 24, 2015.  (*Id.* at 35–37; *see* Doc. 43-25, p. 10.)

### a. O'Haro Failed To Remediate And Received Additional "Not Mets" During Her Final Clinical Rotation

Pursuant to the plan O'Haro agreed to and despite her present complaints, O'Haro performed a final clinical rotation on February 19, 2015.  Hours before the scheduled start of her shift, O'Haro reported for her clinical-care rotation at Hanover Hospital.  (Doc. 31, ¶¶ 134–35.)  As the evening shift began, O'Haro was crying.  (*Id.* ¶ 136.)  Before requiring O'Haro to perform any clinical tasks that evening, Professor Lindstrom assigned O'Haro to observe nurses performing triage in the hospital's emergency department.  (*Id.* ¶ 137.)  Professor Lindstrom felt that having O'Haro observe might calm her down before she would be required to perform clinical skills under evaluation.  (*Id.* ¶ 138.)

After O'Haro observed the nurses in triage, Professor Lindstrom asked O'Haro to articulate a plan of care for a patient with what appeared to be diabetes-related complications.  (*Id.* ¶ 139.)  HACC's Nursing students study diabetes and its complications during the program's first semester and throughout the remaining semesters.  (*Id.* ¶ 140.)  Professor Lindstrom thought that asking O'Haro to articulate a plan of care for a diabetic patient would be easy for her.  (*Id.* ¶ 141.)

But because O'Haro had not observed a diabetic patient in triage, she assumed Professor Lindstrom was asking her a hypothetical scenario; thus, she answered in "general, broad terms."  (Doc. 38, p. 4; *see also* Doc. 42-9, pp. 56–57.)  In that regard, O'Haro asserts that she told Professor Lindstrom that she would need to check medications, "look at" or "check for" lab work, see if it was a new diagnosis, check for sores or ulcers on the patient's feet, and review the patient's diet.  (*See* Doc. 42-9, p. 56.)

Professor Lindstrom's version of events is much different.  According to Professor Lindstrom, O'Haro did not respond when asked to verbalize a plan of care.  (Doc. 31, ¶ 142.)  To fill the void, Professor Lindstrom prompted O'Haro by asking her what tests she should order for such a patient.  (*Id.* ¶ 143.)  O'Haro responded simply with "blood work."  (*Id.* ¶ 144.)  Because O'Haro was supposed to be in her final semester, Professor Lindstrom expected O'Haro to at least request a blood-cell count and glucose levels for such a patient.  (*Id.* ¶ 145.)

That same rotation, Professor Lindstrom instructed O'Haro to administer 5 mg of Valium to a patient and asked O'Haro how fast the medication should be pushed through the IV.  (*Id.* ¶ 146.)  Without consulting any pharmaceutical resources or requesting to do so, O'Haro said, "three to five minutes."  (*Id.* ¶ 147.) A Valium push must be administered at a rate of 5 mg / min.  Therefore, a 5 mg dose should be administered in one minute.  (*Id.* ¶ 148.)  When Professor Lindstrom asked O'Haro if she was sure about the timing, O'Haro quickly said, "yes," without consulting any pharmaceutical resources or otherwise asking for some form of assistance.  (*Id.* ¶¶ 149, 151.)

O'Haro does not recall Professor Lindstrom telling her that if she had any questions about medications she could look them up in pharmacology books or the electronic medication encyclopedia.  (Doc. 42-9, pp. 59–60.)  O'Haro also understood that students could not use the computers in the emergency departments.  (*Id.* at 60; *but see* Doc. 42-9, p. 58 (testifying that Professor Lindstrom instructed her to check a computer when tasked with administering heparin).)[8]  Regardless, the treating physician ultimately cancelled the medication before it could be administered, and Professor Lindstrom did not issue O'Haro a "not met" evaluation related to the issue.  (Doc. 31, ¶¶ 152–53.)

---

[8] In her brief in opposition, O'Haro also seems to contradict these facts by stating in reference to this task that she "was going to check the computer for information."  (Doc. 37, p. 10.)

Afterwards, Professor Lindstrom assigned O'Haro to administer a "bolus dose" of a medication called Heparin through a patient's IV.  (*Id.* ¶ 154.)[9]  A bolus dose is a quantity of fluid or medication administered through a syringe at a controlled, rapid rate.  (*Id.* ¶ 155.)  Nurses use a bolus dose to increase a medication's effects or therapeutic levels.  (*Id.* ¶ 156.)

O'Haro calculated the bolus dose three times for Professor Lindstrom and came up with three different answers.  (*Id.* ¶ 157.)  Dosage calculation is a task that students learn during the Registered Nursing program's first semester.  (*Id.* ¶ 160.) Students in their final semester, like O'Haro, were expected to be able to calculate a bolus dose and its infusion rate.  (*Id.* ¶ 161.)  According to Professor Lindstrom, O'Haro appeared confused and did not know which of her three calculations was correct.  (*Id.* ¶ 158.)  A nurse on duty eventually intervened to provide O'Haro with the correct dosage.  (*Id.* ¶ 159.)

---

[9] In her responsive statement of facts, O'Haro attempts to clarify that "[a]dministration of (a bolus dose of) medication through an IV push was new to [her], having never been taught about it or trained on how to do it."  (*See* Doc. 38, p. 5.)  To support the clarification, O'Haro refers to what can be best described as a conglomerate of several incomplete documents.  (*See id.*; Doc. 37-2.)  While the documents contain references that students would not be permitted to administer IV push medications and that students would not be "adjusting or titrating drips (Heparin, etc.)," without more, it is not at all clear how these documents provide support for the broad assertion that O'Haro "never" learned about or was trained in administering bolus doses as a student in the Registered Nursing program.

In addition to struggling with the calculation, O'Haro struggled to pull the correct amount of medication into the syringe.  (*Id.* ¶ 162.)[10]  In Professor Lindstrom's view, O'Haro did not seem to understand what the measurement marks on the syringe represented.  (*Id.* ¶ 163.)

Once Professor Lindstrom approved O'Haro to administer the medication, which was ordered to be administered by means of the patient's IV device in her arm, O'Haro explained to the patient that she "need[ed] to give [the patient] the IV" and prepared to incorrectly administer the same in the patient's abdomen. (Doc. 31, ¶¶ 164–66; Doc. 42-9, p. 58.)  But as the patient "pull[ed] their gown out," O'Haro stopped herself.  In that moment, Professor Lindstrom instructed O'Haro to consult a nearby computer in order to verify the medication order. (Doc. 31, ¶ 168; *see* Doc. 42-9, pp. 58–59.)

At the computer, O'Haro told Professor Lindstrom the correct route for administering the medication.  (Doc. 31, ¶ 169.)  O'Haro then returned to the patient who began lifting her gown to expose her abdomen.  (*Id.* ¶ 170.)  Professor Lindstrom, who was standing at the foot of the patient's bed, did not hear O'Haro correct the patient by indicating that the medication would be administered through the patient's IV.  (*Id.* ¶ 171; *see* Doc. 43-8, 73–74.)  O'Haro also appeared to

---

[10] *See* footnote 9, *supra*.

advance toward the patient with the syringe in her hand as if she was about to insert the syringe into the patient's abdomen.  (Doc. 31, ¶¶ 172–73.)

Professor Lindstrom called to O'Haro again and made her approach the computer a second time.  (*Id.* ¶ 174.)  Using the computer's cursor, Professor Lindstrom circled the route on the medication order, which reflected that the medication had to be administered through the patient's IV.  (*Id.*)  O'Haro said "I know" and then told the patient how the medication would be administered before administering it through the patient's IV.  (*Id.* ¶¶ 175–76.)  Professor Lindstrom feared that, if she did not intervene, O'Haro would have improperly administered the medication through the patient's abdomen.  (*Id.* ¶ 177.)

Because of O'Haro's errors, Professor Lindstrom informed Professors Lott and LaRue that O'Haro had not satisfied the conditions required to remediate the "not met" evaluations she previously received.  (*Id.* ¶ 178.)  Professor Lindstrom also gave O'Haro "not met" evaluations in the categories of "professionalism" and "clinical problem solving."  (*Id.* ¶ 179.)

### 4.  HACC Dismissed O'Haro From The Nursing Program, And O'Haro Filed An Unsuccessful Academic Appeal

The February 19, 2015 clinical shift was the final one for Nursing 250 during the Spring 2015 semester.  (*Id.* ¶ 180.)  O'Haro failed to remediate the concerns noted in her action plan.  (*Id.* ¶ 181.)  As a result, the Nursing faculty assigned O'Haro a failing grade in Nursing 250.  (*Id.* ¶¶ 182–83.)  That failing grade marked the second failing grade that O'Haro received in the program.  (*Id.* ¶ 184.)  The Nursing faculty consequently dismissed O'Haro from the Registered Nursing program.  (*Id.*; *see also* Doc. 42-3, p. 202; Doc. 42-5, p. 2.)

O'Haro filed an academic appeal, in which she also raised issues about Professors LaRue and Lindstrom.  (Doc. 31, ¶ 185; *see* Doc. 43-16.)  On her appeal, HACC's Appeals of Academic Decisions Committee (the "Committee") reviewed materials submitted by O'Haro and the Nursing faculty.  (Doc. 31, ¶ 187.)  Those materials included O'Haro's denials regarding what the Nursing faculty indicated that they had observed.  (*Id.* ¶ 188.)  Additionally, among the materials were explanations regarding why the faculty graded O'Haro the way that they did and responses to O'Haro's allegations about unfair grading.  (*Id.* ¶ 189.)  In the end, the Committee unanimously upheld the failing grade.  (*Id.* ¶ 186.)

O'Haro now asserts, based on language in the course syllabi, that she should have received a "D" grade in both Nursing 206 and Nursing 250.  Those documents provided for at least a "D" grade in each <u>course</u> where a student had unremediated "not mets" at the end of the course's clinical component, regardless of the student's theory grade.  (*See* Doc. 43-11, p. 7.)  The syllabi also noted that if a student had unremediated "not mets" and / or did not attain at least a C grade in the theory component, the student would not have "[s]uccesful[ly] completed" the course.  (*See id.*)  Stated differently, the student would have failed the course.

Regardless of this statement in the syllabi, O'Haro insists that if she had received a "D," indicating her unsuccessful competition of the courses (two failures), her cumulative GPA would have been high enough to allow her to graduate.  But Nursing 250 was a prerequisite course for graduation.  (Doc. 42-2, p. 2.)  O'Haro also would have needed to end up scoring high enough at the end of Nursing 243 and Nursing 251 to provide her with such a GPA.

### E. O'Haro Has Not Become A Registered Nurse

O'Haro has not become a Registered Nurse since HACC dismissed her from its program.  (Doc. 31, ¶ 190.)  O'Haro, however, has since applied for admission to the Nursing program at Hagerstown.  (*Id.* ¶ 192.)

As a condition of her admission into that program, Hagerstown required O'Haro to take an entrance exam known as the Test of Essential Academic Skills ("TEAS") exam.  (*Id.* ¶ 193.)  Nursing programs around the Country use the TEAS exam to measure whether applicants have the necessary core academic skills to complete demanding Nursing programs.  (*Id.* ¶ 194.)  On five occasions between June 2015 and July 2017, O'Haro took the TEAS exam and received the following scores: 47.3%; 46.0%; 50.7%; 53.3%; and 60.7%.  (*Id.* ¶¶ 195–99.)

On September 27, 2017, Hagerstown rejected O'Haro's application for admission to its Nursing program because her TEAS exam scores "did not meet the minimum required score for [her] file to be reviewed for acceptance into the [N]ursing program." (*Id.* ¶ 200.)  Based on her TEAS exam scores, which have never reached 70%, O'Haro would not be eligible for admission under HACC's current requirements.  (*Id.* ¶¶ 201-02.)

At the same time, Hagerstown ended up accepting O'Haro for its associate degree program in psychology.  (*See* Doc. 42-9, p. 15.)  In or around May 2019, after completing three additional semesters and five courses, O'Haro earned an associate degree in that program.  (*See id.*; Doc. 39-1, pp. 4–5.)  Since then, O'Haro has also been accepted to and started in a part-time bachelor's degree program at Shippensburg University.  (*See* Doc. 42-9, p. 15; Doc. 39-1, p. 9.)  By comparison, if O'Haro had enrolled in HACC's Practical Nursing program,

O'Haro only would have needed to complete a single semester and then, if she succeeded in gaining readmission, just one additional semester in the Registered Nursing program.  (*See* Doc. 42-3, p. 185–88.)

### STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the

court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 56(c)(4) (establishing requirements for affidavits or declarations filed in support of or opposition to a motion for summary judgment).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)). "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

Moreover, the court is not required to go on a fishing expedition in search of relevant evidence.  The court must only consider the evidence that the parties cite to in their summary-judgment filings.  Fed. R. Civ. P. 56(c)(3).

Summary judgment will generally be appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

HACC first argues that, with respect to O'Haro's claim of discrimination under 42 U.S.C. § 1981, she cannot establish a prima facie case of discrimination. (Doc. 30, pp. 32–48.)  Second, HACC argues that O'Haro cannot prove retaliation under § 1981.  (*Id.* at 48–49.)  And third, HACC contends that O'Haro's request for back pay must be stricken.  (*Id.* at 49–51.)   The court begins with HACC's arguments regarding O'Haro's discrimination claim.

36

A.    **No Reasonable Juror Could Conclude That O'Haro Establishes A Claim For Discrimination Under 42 U.S.C. § 1981.**

1.  **The Legal Standard Controlling The Analysis Of O'Haro's Discrimination Claim.**

The starting point for the court's analysis is to identify the controlling legal standard applicable to O'Haro's discrimination claim.  In relevant part, 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  Under the statute, a plaintiff who belongs to a racial minority may bring a claim for purposeful race-based discrimination.  *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (identifying elements) (citation omitted); *see also Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) (concluding that § 1981 "can be violated only by purposeful discrimination"); *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination . . . .") (citation

omitted).[11]  Of course, the purposeful discrimination must concern an activity

identified in 42 U.S.C. § 1981(a).  *See Brown*, 250 F.3d at 797.

In order to demonstrate purposeful discrimination for the purpose of a

§ 1981 claim, a plaintiff may rely on either direct or circumstantial evidence.

Generally, direct evidence is "overt or explicit evidence which directly reflects

discriminatory bias by a decision maker" – think of a "smoking gun."  *Ke v. Drexel*

*Univ.*, No. 11-6708, 2015 WL 5316492, at *12 (E.D. Pa. Sept. 4, 2015) (citing

*Armbruster v. Unisys Corp.*, 32 F.3d 768, 778–89 (3d Cir. 1994)).  This case,

however, deals with purported circumstantial evidence of discrimination, not direct

evidence.  Accordingly, the burden-shifting framework set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs and will guide the court's

analysis.  *See Manning v. Temple Univ.*, 157 F. App'x 509, 513–14 (3d Cir. 2005)

(applying the burden-shifting framework to affirm the district court's grant of

summary judgment to the defendants on plaintiff's race-discrimination claim under

§ 1981 and other federal statutes where the plaintiff failed to present a prima facie

case of discrimination); *Nahas v. Shore Med. Ctr.*, --- F. Supp. 3d ----, 2019 WL

---

[11] O'Haro's discrimination claim is premised on her race <u>and</u> national origin.  Critically, § 1981 "does not provide a remedy to plaintiffs discriminated against 'solely on the place or nation of [their] origin.'" *Broom v. Saints John Neumann & Maria Goretti Cath. High Sch.*, 722 F. Supp. 2d 626, 631 (E.D. Pa. 2010) (quoting *Al-Khazraji*, 481 U.S. at 613; citing *Bennun v. Rutgers State Univ.*, 941 F.2d 154, 172 (3d Cir. 1991) (explaining that a claim of discrimination based "solely on [a plaintiff's] national origin . . . would not be sufficient for a § 1981 claim under Al-Khazraji")).  Thus, to the extent O'Haro intends to assert a claim of discrimination based solely on her national origin, HACC is entitled to judgment on such claim as a matter of law.

4635574, at *16 (D.N.J. 2019) ("Claims brought under § 1981 are analyzed under the *McDonnell-Douglas* burden-shifting framework.").[12]

At the first step of the *McDonnell-Douglas* framework, a plaintiff must establish a prima facie case of discrimination. Where there is a claim under § 1981, "the elements of a prima facie case depend on the facts of the particular case." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). Whatever the contours, a plaintiff must be required to present evidence that raises an inference of discrimination. *See Manning*, 157 F. App'x at 513 (citing *Storey v. Burns Int'l Security Servs.*, 390 F.3d 760, 764 (3d Cir. 2004); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 352 (3d Cir. 1999)).

With respect to this case, as noted, the Third Circuit has not adapted the prima facie test used in the employment-discrimination context to the education context. *Manning*, 157 F. App'x at 513. Nevertheless, while O'Haro takes issue with the application of the *McDonnell-Douglas* framework, *see* Doc. 37, p. 18, she cites to the prima facie test used by United States District Court for the Eastern

---

[12] In her brief in opposition, O'Haro cites *Manning* for the proposition that the burden-shifting framework "has not been adapted to the education discrimination context in the Third Circuit." (Doc. 37, p. 18.) In *Manning*, however, the Third Circuit settled on the framework to rule on the merits of the appeal in a case that involved a discrimination claim in the education context. 157 F. App'x at 513–14. What might have caused some confusion for O'Haro is the panel's recognition that the Third Circuit has not adapted the prima facie test used in the employment-discrimination context to the education-discrimination context. *See id.* at 513 (stating after setting forth the prima facie test in the employment-discrimination context that the court "has not adapted the *McDonnell Douglas* prima facie test to the education discrimination context") (emphasis added).

District of Pennsylvania in *Ke v. Drexel University* as the test to prove

discrimination in her own case, *id.* at 19–20.

Under the "*Ke* test," O'Haro must demonstrate that she: (1) "is a member of

a protected class;" (2) "suffered an adverse action [by HACC] in h[er] pursuit of

h[er] education;" (3) "is qualified to continue h[er] pursuit of h[er] education;" and

(4) "was treated differently from similarly situated students who are not members

of a protected class."  2015 WL 5316492, at *17 (citing *Bell*, 351 F.3d at 252–53).

Aside from the fourth element, which is not always required in the employment-

discrimination context, *see Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n. 7 (3d

Cir. 2003) (noting that the showing is not necessary for a discrimination claim

under Title VII), the *Ke* test is functionally no different from the prima facie test in

the employment-discrimination setting that HACC asks the court to use.  (*See* Doc.

30, p. 32.)

Indeed, generally, in the employment-discrimination setting, to establish a

prima facie case of discrimination, a plaintiff must demonstrate that: (1) she

belongs to a protected class; (2) she was qualified for the position; (3) she was

subject to an adverse employment action despite being qualified; and (4) under

circumstances that raise an inference of discriminatory action, the employer

continued to seek out individuals with qualifications similar to the plaintiff's to fill

the position.  *Sarullo*, 352 F.3d at 797 (citing *McDonnell Douglas*, 411 U.S. at

802; *Pivirotto*, 191 F.3d at 348 n. 1).  Furthermore, by requiring O'Haro to prove as part of the test that she "was treated differently from similarly situated students who are not members of a protected class," the *Ke* test supplies the necessary proof of an inference of discrimination that must be included in any prima facie test used to demonstrate discrimination.

Assuming O'Haro could establish a prima facie case of discrimination under the *Ke* test, the burden would shift to HACC at the second step of the *McDonnell-Douglas* framework "to articulate a legitimate, nondiscriminatory reason" for the adverse action.  *See McDonnell Douglas*, 411 U.S. at 802 ("The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.")  Then, at the third step, if HACC were to carry its burden on the second step, O'Haro would be required to prove by a preponderance of evidence that "the legitimate reasons offered . . . were not [the] true reasons, but were a pretext for discrimination."  *Texas Dep't of Cmty. Aff. v. Burdine*, 450 U.S. 248, 253 (1981).

### 2. O'Haro Cannot Establish A Prima Facie Case Of Discrimination.

HACC contends that O'Haro "cannot satisfy her prima facie burden because she was not qualified to remain in HACC's [Registered Nursing] program after she failed [her second course,] Nursing 250 during the [s]pring of 2015."  (Doc. 30, pp.

32–33.)  As explained in the following paragraphs, the court agrees, which is fatal to O'Haro's claim.

Initially, when examining whether O'Haro was qualified to continue her pursuit of her education, the court must specify the adverse action at issue.  HACC seems to simply assume the adverse action was the dismissal from the Registered Nursing program and not the failing grade O'Haro received in Nursing 250.  Even so, the court also concludes that the adverse action must be HACC's decision to dismiss O'Haro from its nursing program.  Indeed, for purposes of § 1981, any purposeful discrimination must concern an activity identified in § 1981(a).  And here, the purposeful discrimination claim appears as if it arises from HACC's "termination" of its "contract" with O'Haro, in other words, the dismissal of O'Haro from HACC's nursing program.  *See* 42 U.S.C. § 1981(a); *id.* § 1981(b) (defining the term "Make and enforce contracts" to include the termination of contracts); *see also Miller v. Thomas Jefferson Univ. Hosp.*, 908 F. Supp. 2d 639, 650 (E.D. Pa. 2012) (observing that "the relationship between university and student is contractual in nature") (citing *Reardon v. Allegheny Coll.*, 926 A.2d 477, 480 (Pa. Super. Ct. 2007)).

Having settled on the relevant adverse action, the court turns to the issue at hand: whether O'Haro could demonstrate that she was qualified to continue her education in HACC's program at the point in time when the adverse action occurred (i.e. when she was dismissed from HACC's Registered Nursing program).

It is undisputed that any student who failed two independent courses would be dismissed from the program and would not automatically be eligible for readmission. The same student, though, could seek readmission upon attaining a certificate in HACC's Practical Nursing certificate program and passing the Practical Nursing licensing exam.

After failing Nursing 206, O'Haro proceeded to receive a second failing grade in Nursing 250. It is undisputed that O'Haro did not appeal her failing grade in the theory component of Nursing 206. O'Haro also does not cite record evidence to refute the assertion by HACC that a successful grade appeal for her would have been unprecedented given her failure by 8.5 points. Likewise, while O'Haro disputes events leading to certain "not met" evaluations that she received in Nursing 250, she does not dispute the following:

- Professor Molnar (in Nursing 250) commented that she had "very strong concerns about [O'Haro's] grasp of the care of the patient from a critical thinking perspective."

- On February 12, 2015 (in Nursing 250), O'Haro failed to properly explain a medication injection to a patient, and commented that, if she had been a professional nurse at the time, she would have asked a co-worker to administer the medication for her, potentially disturbing the allocation of duties among nursing staff.

- On February 13, 2015 (in Nursing 250), O'Haro lacked a clinical justification for her persistent refusal to administer prescribed heart medication.

- On February 19, 2015 (in Nursing 250 – the "remediation clinical"), O'Haro struggled to pull the correct amount of medication into a syringe and required Professor Lindstrom to intervene when tasked with administering medication, which was to be administered through a patient's IV.

In any event, the negative clinical evaluations O'Haro received in Nursing 250, which the Committee reviewed and apparently affirmed on O'Haro's academic appeal, are entitled to substantial deference. *See generally Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 224 (1985) ("When judges are asked to review the substance of a genuinely academic decision . . . they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.") The clinical evaluations are academic decisions based on professional judgment calls by nursing program faculty members. O'Haro has not cited to evidence of record to demonstrate that the faculty members' "not met" evaluations represent a departure from accepted academic norms.

To be sure, a faculty member's evaluation of a nursing student's "professionalism," "critical thinking," and "caring" in a clinical setting appears to involve a professional judgment call based on education, training, and experience. The court has not been presented with evidence sufficient to reject the professional judgment calls that resulted in "not met" evaluations for O'Haro. *See also Ke*, 2015 WL 5316492, at *19 (quoting *Hajjar-Nejad v. George Washington Univ.*, 37 F. Supp. 3d 90, 135 (D.D.C. 2014), citing *Ewing*, 474 U.S. at 226) ("[A] federal court 'is not the appropriate forum in which to . . . evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions – decisions that require 'an expert evaluation of cumulative information and [are] not readily adapted to the . . . tools of judicial . . . decisionmaking.'").

At the point in time when O'Haro had failed two nursing classes, it was appropriate for HACC, pursuant to its policy, to dismiss O'Haro from the program. It is undisputed that she never completed the program, passed the Practice Nursing licensing exam, or applied for re-admission through that available avenue.

Based on this evidence, no reasonable juror could conclude that O'Haro was qualified to continue in the Nursing Program. *See*, *e.g.*, *Miller v. Temple Univ.*, No. 03-4012, 2004 WL 3019230, at *3, *6 (E.D. Pa. Dec. 30, 2004) (concluding on summary judgment that the plaintiff could not satisfy the qualification element

in that she was removed from the defendant medical school, pursuant to school policy, after failing courses while on academic probation), *aff'd* 157 F. App'x 509 (3d Cir. 2005).

In her brief in opposition, despite identified it is an element of her case (even though not in the context of a prima facie case), *see* Doc. 37, p. 20, O'Haro does not respond to HACC's argument that she was not qualified to continue in the Registered Nursing program because of her failing grades. Rather, O'Haro takes aim at the requirement that she prove that she was treated differently from "similarly situated" students who were not members of her protected class. (*See* Doc. 37, pp. 18–25.) But that is a separate issue the court would only need to address if the qualification element of the prima facie case could be established by O'Haro.

In sum, no reasonable juror could find that O'Haro was qualified to continue in her educational pursuit in HACC's Registered Nursing program. Consequently, as a matter of law, O'Haro cannot establish a prima facie case of discrimination, and HACC is entitled to summary judgment on her discrimination claim.

**B.    O'Haro Abandons Her Retaliation Claim And Request For Back Pay.**

In O'Haro's brief in opposition, she does not mention her claim for retaliation or request for back pay. Nor does O'Haro respond to HACC's arguments regarding the same. O'Haro's failure to offer any response in her

opposition to HACC's motion for summary judgment permits the court to deem the claim and request as abandoned, which the court will do.  *See Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014) (collecting cases) ("[A] non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended.").  Because of this, the court will also award judgment to HACC on the abandoned retaliation claim in Count II.  *See*, *e.g.*, *Mills v. City of Harrisburg*, 589 F. Supp. 2d 544, 558 n. 15 (M.D. Pa. 2008) (deeming claims to be "abandoned" and granting summary judgment to defendants when counsel failed to respond to arguments raised against those claims) (citations omitted).

## CONCLUSION

For the foregoing reasons, the court will grant HACC's motion for summary judgment and enter judgment for HACC on the discrimination and retaliation claims in Count II.  Furthermore, because no other claims remain, the court will direct the Clerk of Court to close this case.  An appropriate order will follow.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: September 30, 2020